## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WHYTE MONKEE PRODUCTIONS, LLC, an Oklahoma Limited Liability Company; and TIMOTHY SEPI, an individual,<br><br>    Plaintiffs,<br><br>    v.<br><br>NETFLIX, INC., a Delaware Corporation; and ROYAL GOODE PRODUCTIONS LLC, a New York Limited Liability Company,<br><br>    Defendants. | **CASE NO.: 5:20-CV-00933-D**<br><br>Judge:    Hon. Timothy D. DeGiusti |

## DEFENDANTS NETFLIX, INC. AND ROYAL GOODE PRODUCTIONS LLC'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................2

STANDARD ON SUMMARY JUDGMENT ................................................. 15

SHAM AFFIDAVIT DOCTRINE ................................................................ 16

ARGUMENT........................................................................................... 17

I.      Plaintiffs Cannot Establish the Requisite Ownership or Originality................. 17

        A.      The Park Owned the Copyrights as "Works Made for Hire."................. 17

                1.      Sepi Acted Within the Scope of His Employment....................... 18

                2.      Plaintiffs Could Not Own the Videos by Oral Agreement. .......... 23

        B.      The Funeral Video is Not Original........................................................... 25

II.     Defendants' Use of the Videos in the Documentary Was Fair Use. ................... 25

        A.      Factor 1*: The Documentary is Highly Transformative............................ 25

        B.      Factor 2: The Videos are Primarily Factual and Published...................... 28

        C.      Factor 3: The Amount of Use Weighs in Favor of Defendants. .............. 28

        D.      Factor 4: There Is No Genuine Issue of Fact as to Market Harm. ........... 29

CONCLUSION ........................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adler v. Wal-Mart Stores, Inc.*,
  144 F.3d 664 (10th Cir. 1998) ...................................................................... 16

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ........................................................................... 29

*Avtec Sys., Inc. v. Peiffer*,
  21 F.3d 568 (4th Cir. 1994) .................................................................... 18, 22

*Bank of Illinois v. Allied Signal Safety Restraint Systems*,
  75 F.3d 1162 (7th Cir. 1996) ........................................................................ 17

*Becker v. Bateman*,
  709 F.3d 1019 (10th Cir. 2013) .................................................................... 15

*Big Cat Rescue Corp. v. Big Cat Entertainment Group, Inc. et al.*,
  No. 5:13-FJ-00001 (W.D. Okla. 2013), Dkt. No. 1 .............................. 5, 6, 9

*Big Cat Rescue Corp. v. G.W. Exotic Animal Mem'l Found.*,
  2016 WL 407314 (W.D. Okla. Feb. 2, 2016) .............................................. 20

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ................................................... 26, 27, 28, 29

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ......................................................................... 26

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) ........................................................................ 27

*Brown v. Netflix*,
  855 F. App'x 61 (2d Cir. 2021) ......................................................... 26, 27, 28

*Brown v. Netflix, Inc.*,
  462 F. Supp. 3d 453 (S.D.N.Y. 2020) .......................................................... 26

*Burns v. Board of County Com'rs of Jackson Cnty.*,
  330 F.3d 1275 (10th Cir. 2003) .................................................................... 17

*Calkins v. Playboy Enters. Int'l, Inc.*,
  561 F. Supp. 2d 1136 (E.D. Cal. 2008) ........................................................ 30

# TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) ................................. 25

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................ 25, 28, 30

*Cariou v. Prince*,
714 F.3d 694 (2d. Cir. 2013) ................................... 26

*Carol Wilson Fine Arts, Inc. v. Zifen Qian*,
71 F. Supp. 3d 1151 (D. Ore. 2014) ....................... 19, 21

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................. 17, 18

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ................................................ 2

*Essick v. Yellow Freight Sys, Inc.*,
965 F.2d 334 (7th Cir. 1992) .................................. 17

*Feist Publ., Inc. v. Rural Telephone Serv. Co., Inc.*,
499 U.S. 340 (1991) ................................................ 24

*Fields v. Baseline Properties, LLC*,
2020 WL 10790293 (W.D. Okla. July 10, 2020) ...................... 15

*Fleurimond v. New York Univ.*,
876 F. Supp. 2d 190 (E.D.N.Y. 2012) .................... 19, 21

*Franks v. Nimmo*.
796 F.2d 1230 (10th Cir. 1986) ............................ 17, 20

*Genzmer v. Pub. Health Trust of Miami-Dade Cnty.*,
219 F. Supp. 2d 1275 (S.D. Fla. 2002) ...................... 19

*Gladwell Gov't Servs., Inc. v. Cnty. of Marin*,
265 F. App'x 624 (9th Cir. 2008) ............................ 23

*Hernandez v. City of Napa*,
2010 WL 4010030 (N.D. Cal. Oct. 13, 2010) ..................... 16

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

*Hiatt v. Colo. Seminary*,
858 F.3d 1307 (10th Cir. 2017) ................................................................ 15

*Hofheinz v. A & E Television Networks*,
146 F. Supp. 2d 442 (S.D.N.Y. 2001) ...................................................... 30

*Hofheinz v. AMC Productions, Inc.*,
147 F. Supp. 2d 127 (E.D.N.Y. 2001) ...................................................... 30

*Huebbe v. Okla. Casting Co.*,
663 F. Supp. 2d 1196 (W.D. Okla. 2009) ................................................ 18

*Hustler Mag., Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) ................................................................. 28

*Kelly v. Arriba Soft. Corp.*,
336 F.3d 811 (9th Cir. 2003) ............................................................. 25, 28

*Law Co., Inc. v. Mohawk Const. and Supply Co.*,
577 F.3d 1164 (10th Cir. 2009) ............................................................... 16

*Lewis v. Activision*,
2013 WL 5663103 (N.D. Cal. Oct. 17, 2013) ..................................... 19, 22

*Martinez v. Barnhart*,
177 F. App'x 796 (10th Cir. 2006) .......................................................... 17

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
528 F.3d 1258 (10th Cir. 2008) ......................................................... 17, 24

*Miller v. CP Chemicals, Inc.*,
808 F. Supp. 1238 (D.S.C. 1992) ....................................................... 19, 22

*Norse v. Henry Holt & Co.*,
847 F. Supp. 142 (N.D. Cal. 1994) .......................................................... 30

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004) ..................................................................... 26

*Oriental Art Printing, Inc. v. Goldstar Printing Corp.*,
175 F. Supp. 2d 542 (S.D.N.Y. 2001) ...................................................... 24

# TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

*President and Fellows of Harvard College v. Elmore*,
 2016 WL 7494274 (D. N. Mex. May 19, 2016) ......................................................... 24

*Red Label Publ'g, Inc. v. Chila Prods.*,
 388 F. Supp. 3d 975 (N.D. Ill. 2019) ................................................................. 27, 29

*Rouse v. Walter & Assocs., LLC*,
 513 F. Supp. 2d 1041 (S.D. Iowa 2007) ............................................................. 19, 22

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
 969 F.2d 410 (7th Cir. 1992) ............................................................................ 23

*Scott v. Harris*,
 550 U.S. 372 (2007) ....................................................................................... 16

*Seltzer v. Green Day, Inc.*,
 725 F.3d 1170 (9th Cir. 2013) .................................................................. 26, 28, 29

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
 709 F.3d 1273 (9th Cir. 2013) ................................................................. 25, 26, 27

*Threshold Media v Corp. v. Relativity Media, LLC*,
 2013 WL 12331550 (C.D. Cal. Mar. 19, 2013) ...................................................... 29

*U.S. v. Maldonado-Passage*,
 4 F.4th 1097 (10th Cir. 2021) ......................................................................... 3, 6

*Vanderhurst v. Colo. Mountain Coll. Dist.*,
 16 F. Supp. 2d 1297 (D. Colo. 1998) ............................................................. 19, 22

*Weinberg v. Dirty World, LLC*,
 2017 WL 5665023 (C.D. Cal. July 27, 2017) ........................................................ 29

*Williams v. FedEx Corp. Servs.*,
 849 F.3d 889 (10th Cir. 2017) .......................................................................... 16

## STATUTES

18 Okla. Stat.
 § 2004 ............................................................................................................ 6
 § 2005 ............................................................................................................ 6

# TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

17 U.S.C.

§ 101 ............................................................................................................. 2, 18

§ 102 ................................................................................................................. 18

§ 107 ........................................................................................................... *passim*

§ 201 ..................................................................................................... 2, 17, 18, 23


## OTHER AUTHORITIES

Fed. R. Civ. P.

30(e) ................................................................................................................. 17

56(a) ................................................................................................................. 15

56(c)(1)(A) ...................................................................................................... 16

Nimmer on Copyright § 3.03[C][3] ................................................................. 24

2 Patry on Copyright § 3:27 ............................................................................ 23

Restatement (Second) of Agency § 228 (1958) ......................................... 18, 19

Defendants Netflix, Inc. ("Netflix") and Royal Goode Productions LLC ("Royal Goode"), respectfully move the Court for an order granting summary judgment in favor of Defendants. In support thereof, Defendants state as follows.

## INTRODUCTION

Plaintiffs have brought this meritless copyright infringement action over certain video clips that appear in Defendants' popular documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"). The Documentary, which featured several notable characters, focused on the story of Joseph Allen Schreibvogel, aka Joseph Maldonado-Passage, aka Joe Exotic ("Exotic")—a controversial figure who founded the Garold Wayne Zoological Park (the "Park"), raised tigers and other exotic animals, ran for Oklahoma Governor and U.S. President, and later went to prison.

Plaintiff Whyte Monkee Productions, LLC ("Whyte Monkee") is a sham LLC created to shield assets. Plaintiff Timothy Sepi ("Sepi") is a former Park employee who worked as a cameraperson taking videos and photographs. Sepi claims that he or Whyte Monkee owns the copyright in eight videos (the "Videos") that appeared in the Documentary. However, in an earlier lawsuit, Sepi gave sworn testimony completely contradicting his claims here. To salvage this lawsuit, Sepi now brazenly asserts that he committed "perjury" in that prior proceeding.[1] Sepi is a perjurer, all right: but he has lied in ***this*** proceeding, in which he has a clear financial motivation to prevaricate. Summary

---

[1] *See, e.g.,* Deposition of Timothy Sepi, Vol. II (Ex. 2 to Declaration of Emily F. Evitt) at 385:21-386:9 ([Mr. Sepi]: "You've listed lines from a deposition that I admitted to perjury on."). *See* Statement of Facts ¶¶ 31-33 and pp. 19-21, *infra*.

judgment is appropriate for two separate reasons.

*First*, under the Copyright Act's work-made-for-hire doctrine (17 U.S.C. §§ 101, 201), Plaintiffs cannot establish copyright ownership. The Park, as Sepi's employer, was the author, and therefore the owner, of the Videos. While Plaintiffs claim Sepi filmed the Videos outside the scope of his employment, his sworn 2016 testimony in a garnishment action directly refutes this contention. The sham affidavit doctrine precludes Plaintiffs from repudiating that former testimony. Moreover, even crediting Sepi's sham testimony, the undisputed facts *still* establish that Sepi filmed seven of the Videos in the scope of his employment, and that the remaining Video is unoriginal and not protected by copyright.

*Second*, even if Plaintiffs owned the Videos, Defendants' transformative use of the Videos in the Documentary would be quintessential fair use under 17 U.S.C. § 107. The fair use doctrine ensures that copyright law does not impinge upon freedom of expression, particularly where, as here, excerpts of a work serve a fundamentally different purpose. *See Eldred v. Ashcroft*, 537 U.S. 186, 218-21 (2003) ("The fair use defense affords considerable latitude for scholarship and comment.") (quotation omitted). As set forth in detail below, summary judgment for Defendants is appropriate.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Garold Wayne Zoological Park and the Business of Filming Videos at the Park

1.     Joseph Allen Schreibvogel, aka Joseph Maldonado-Passage, aka Joe Exotic ("Exotic") founded what later became the Garold Wayne Interactive Zoological Park or

"Garold Wayne Zoo"[2] years before Plaintiff Timothy Sepi ("Sepi") started working there in 2015. Sepi Deposition, Volume I taken May 13, 2021 ("**Depo. V.1**"), **attached as Ex. 1 to Declaration of Emily F. Evitt ("Evitt Decl."),** at 23:12-20; 25:5-27:1; 29:5-19 & Depo. Ex. 1 (Sepi Deposition, Sept. 16, 2016 ("**2016 Depo.**"), **attached as Exs. 3-4 to Evitt Decl.**) at 8:1-11:14; 46:17-50:16; 109:1-20; Second Amended Complaint ("SAC") [Dkt. No. 40], ¶¶ 8-9; *U.S. v. Maldonado-Passage*, 4 F.4th 1097 (10th Cir. 2021).

2.      Before Sepi started working at the Park, the Park had a studio that was used to produce a web series called *Joe Exotic TV*—a program that focused on Exotic and the Park. 2016 Depo. at 61:4-63:1; 75:23-77:7; 145:5-22; Depo. V.1 at 22:15-23:8.

3.      Before Sepi started working at the Park, Exotic made videos that appeared on *Joe Exotic TV* or its YouTube channel, and some of which were sold on a CD/DVD combo pack in the Park's gift shop. Depo. V.1 at 57:4-16; 71:14-20; 84:3-85:21; 189:6-17; 198:19-199:17 & Depo. Ex. 13 (Evitt Decl. Ex. 18); Vol. II of Sepi Depo. taken Oct. 5, 2021 ("**Depo. V2**"), **attached as Ex. 2 to Evitt Decl.**, at 334:14-335:16; 2016 Depo. at 116:12:17; Evitt Decl. ¶¶ 30-31 & Exs. 29-30; Declaration of D. Hall, ¶¶ 1-6 & Ex. A.

4.      During early 2015, producer Rick Kirkham ("Kirkham") oversaw studio operations—including a "video team" of approximately four people—and produced *Joe Exotic TV*. Depo. V.1 at 22:15-23:11; 39:5-21; 2016 Depo. at 75:23-77:7.

**Sepi Meets Exotic in 2015 and Begins Working for the Park**

5.      In or about March 2015, Sepi traveled to the Park, met Kirkham and Exotic,

---

[2] The names and legal entities under which this facility has operated, together with all successors, are referred to herein collectively as the "Park."

and began working for the Park. SAC, ¶ 8; 2016 Depo. at 71:14-77:17; 78:19-81:23; Depo. V.1 at 23:12-20; 32:12-15.

6.      Exotic offered Sepi a job working at the Park as a cameraperson for *Joe Exotic TV*; Sepi's job was both to make videos at the Park and to take still pictures. 2016 Depo. at 71:14-78:2; 86:17-88:7; 96:11-97:22; 145:5-22; Depo. V.1 at 23:12-20.

7.      The term "cameraman" or "cameraperson," can refer to someone who takes still pictures, video, or both. 2016 Depo. at 88:2-10; Depo. V.1 at 30:14-19; 212:12-21.

8.      There is no written agreement between Sepi and the Park granting either Plaintiff a copyright interest in any work at issue in this case. Sepi Responses to Netflix, Inc.'s First Set of Interrogatories ("Resp. to Interrog.") (Evitt Decl., ¶ 6 & Ex. 5) at Nos. 1-2; 2016 Depo. at 92:11-93:7; 246:15-247:17; Depo. V.1 at 38:1-39:4; 202:4-7.

9.      During Sepi's employment at the Park, Sepi had access to and used the Park's equipment and tools. He received as compensation $150 a week plus benefits (including a room in a trailer and free utilities such as electricity and water). Depo. V.1 at 63:14-21; 66:1-18; 85:7-86:6; 2016 Depo. at 75:17-76:11; 86:17-87:22; 88:2-22; 89:20-90:19; 106:5-107:13; 109:1-20; 219:9-226:4; Depo. V.2. 326:3-10; *see also* ¶¶ 12, 18, 23, *infra,* incorporated by reference. Aside from any tips, he considered his $150-a-week salary to be full compensation for all his activities. 2016 Depo. at 110:10-111:18; 122:8-15; 132:12-133:10; 216:4-24; 246:6-248:20; *see also* ¶ 27, *infra*.

**The March 2015 Fire and the Stoppage and Recommencement of *Joe Exotic TV***

10.     Within a week after Sepi started working at the Park, a fire destroyed the studio and its contents. Kirkham and his team quit. Depo. V.1 at 29:5-10; 31:20-32:11;

40:17-41:10; 2016 Depo. at 62:2-19; 78:19-23; 81:24-82:25; 93:25-94:21; 96:11-14.

11.    Because the fire destroyed the video equipment, Sepi's job as a cameraperson for a time solely entailed taking photographs for Park tours; he also performed other Park duties. Depo. V.1 at 41:11-19; 2016 Depo. at 93:25-95:4.

12.    Soon after the fire destroyed the Park's equipment, a new studio was built on Park premises, and Michael Sandlin ("Sandlin"), a sponsor of *Joe Exotic TV* who operated a facility in Louisiana called the Tiger Truck Stop, agreed to purchase new equipment for the Park, including video cameras and computers that Sepi used for videos. Sepi had no involvement in making these arrangements. 2016 Depo. at 95:2-96:10; 179:13-181:10; 219:9-226:4; 236:20-22; Depo. V.1 at 52:17-53:16; 54:21-57:4; 166:7-167:21; 172:12-173:9 & Depo. Ex. 8 (Evitt Decl. Ex. 16) at timestamp 16:35-17:14; Depo. V.2 at 525:7-527:18 & Depo. Ex. 52 (Evitt Decl. Ex. 27).

13.    Using the new video equipment that Sandlin provided, *Joe Exotic TV* resumed in or about May 2015. Depo. V.1 at 42:18-20; 57:5-20; 2016 Depo. at 94:16-97:25. For a time, Sepi was the sole videographer. 2016 Depo. at 96:11-14; 99:6-21; 129:23-131:8; 145:23-146:7. He did not consider himself a "boss." *Id.* at 98:22-24.

14.    On or about May 7, 2015, the first post-fire episode of *Joe Exotic TV* aired. Depo. V.1 at 166:7-167:21 & Depo. Ex. 8 (Evitt. Decl. Ex. 16) at timestamp 16:35-17:14.

**Exotic's Dispute With Carol Baskin**

15.    As of May 2015, Exotic was in an ongoing dispute with a rival zookeeper named Carole Baskin ("Baskin"), who sought to collect an approximately $1 million judgment against him. Depo. V.1 at 154:20-155:15; *see also Big Cat Rescue Corp. v. Big*

*Cat Entertainment Group, Inc. et al.*, No. 5:13-FJ-00001 (W.D. Okla. 2013) (the "Garnishment Action"), Dkt. No. 1. Baskin's entity had initiated garnishment proceedings in Oklahoma against Exotic in or about 2013. *Id.; see also* 2016 Depo. at 5:7-6:10; Depo. V.2 at 485:9-14; *U.S. v. Maldonado-Passage*, 4 F.4th at 1099-1100; Declaration of Rebecca Chaiklin ("Chaiklin Decl."), ¶¶ 1, 7-9, 21 & Ex. 1.

16.     On May 5, 2015, Articles of Organization for a new entity, "Whyte Monkee Productions, LLC," were filed with Oklahoma's Secretary of State. Sepi is not the contact for the LLC; the Articles of Organization list Exotic's email address (joe_exotic@yahoo.com) and the Park's street address. "Tim Sepi" only appears as the signature name.[3] Depo. V.1. at 110:16-111:14 & Depo. Ex. 4 (Evitt Decl. Ex. 15); 2016 Depo. at 134:7-139:24. Sepi did not prepare or approve the LLC paperwork for Whyte Monkee Productions, LLC; if he had, he would have used "Timothy" as his signature name, not "Tim." 2016 Depo. at 134:18-136:1; 139:1-141:11; 154:14-16; 167:17-20.

**Sepi's Employment at the Park**

17.     Sepi started his day at the Park around 8:00 a.m. and worked until late at night. He split the time during his workday among taking tour photographs, filming and editing for *Joe Exotic TV*, and filming campaign videos for Exotic. Depo. V.1 at 58:9-61:18; 81:8-15; 85:15-86:6; 234:19-235:17; 236:4-15; Depo. V.2 at 342:17-343:8;

---

[3] Oklahoma law does not require that a signature on Articles of Organization for a limited liability company designate a member or owner of the company. 18 Okla. Stat. §§ 2004-05; *see also* "Procedures for Organizing an Oklahoma Limited Liability Company," available at https://www.sos.ok.gov/forms/Fm0074.PDF at p. 2, ¶ 6 ("The person who signs is not required to be a member of the limited liability company . . .").

412:16-413:12. Sepi spent more than 20 hours per week following and filming Exotic and filming video of "everything that was going on, the day-to-day operations" on Park premises, as well as editing, publishing, producing, or broadcasting *Joe Exotic TV*. 2016 Depo. at 199:8-21; Depo. V.1 at 81:8-83:15.

18.     In working on videos for *Joe Exotic TV*, Sepi performed his job in the studio (located on Park premises) and used the Park's camera, editing equipment, and computer (all of which Sandlin had loaned to the Park). 2016 Depo. at 174:4-175:15; 219:11-220:24; 221:16-225:11; Depo. V.1 at 52:17-55:19; 58:9-61:18; Depo. V.2 at 525:7-527:18 & Depo. Ex. 52 (Evitt Decl. Ex. 27).

19.     *Joe Exotic TV* was a mostly unscripted series. Each episode typically featured footage from around the Park. The show would sometimes include unwritten "skits" that Exotic invented. Depo. V.1 at 79:17-82:15; 83:11-84:21; 169:11-170:15; Depo. V.2 at 341:13-342:6; 2016 Depo. at 145:5-22. Another key feature of the show was Exotic talking about whatever was on his mind. Depo. V.1 at 170:6-15 & Depo. Ex. 8 (Evitt Decl. Ex. 16); Depo. V.2 at 342:3-6.

20.     Sepi could not "really tell Joe what to say." Depo. V.1 at 169:11-170:15; Depo. V.2 at 342:3-6. Exotic "does whatever he wants." *Id.* at 386:10-20; 402:4-404:7.

21.     Sepi's responsibilities for filming and producing *Joe Exotic TV* remained constant for the entire time the Park employed him. Depo. V.1 at 69:7-20.

22.     While Sepi was employed by the Park, he shot footage for Exotic's presidential and gubernatorial campaigns. The campaign videos were filmed during regular work hours, and many were filmed at the Park. Sepi Depo V.2 at 382:9-18 &

Depo. Ex. 29 (Evitt Decl. Ex. 9); 392:15-393:2; 406:20-407:17 & Depo. Ex. 31 (Evitt Decl. Ex. 11); 410:6-19; 412:16-413:12.

23.    Sepi generally filmed the campaign videos using the same camera equipment he used for *Joe Exotic TV—i.e.*, the Park's equipment borrowed from Sandlin. Depo. V.2 at 326:3-15; 412:16-413:12.

24.    Sepi filmed videos for *Joe Exotic TV* "to basically promote what the cause of the foundation of the nonprofit [that operated the Park] was doing, and that was to care for animals that were a species that was dying in the wild…"  Depo. V.2 at 470:14-471:18.

25.    The videos that Sepi filmed were intended to "provide publicity for the Zoo."  Resp. to Interrog. (Evitt Decl. Ex. 5) at No. 16.

26.    One of Sepi's objectives in filming was also to make Exotic "look good," whether what Sepi was filming "was a presidential video, a music video, a PSA, or just around the park."  Depo. V.2 at 318:14-319:6.  Sepi wanted to benefit Exotic. *Id.*

27.    Sepi was not paid any additional compensation beyond his $150 weekly salary for his work on any of the Videos. Depo. V.1 at 85:7-86:6; 2016 Depo. at 246:6-248:20; *see also id.* at 88:2-22; 107:7-12; 122:8-12.

**New Park Ownership and Sepi's Departure**

28.    In or around February 2016, ownership of the Park was transferred to Big Cat Institute, an entity owned and controlled by Jeffrey Lowe ("Lowe"); the Park was renamed the Greater Wynnewood Exotic Animal Park. Depo. V.1 at 64:19-70:21 & Depo. Ex. 2 (Evitt Decl. Ex. 14); 2016 Depo. at 8:18-11:14; 234:21-237:9.

29.     After the transfer of the Park's ownership, Exotic continued to serve as its Entertainment Director. 2016 Depo. at 236:13-238:4; 241:4-242:4; Depo. V.1 at 86:7-9.

30.     Sepi stopped working for the Park in or around August 2016. Depo. V.1 at 59:12-60:11; 71:6-13; *see also* 2016 Depo. at 219:19-220:17.

**Sepi's 2016 Deposition**

31.     In September 2016, Sepi gave a deposition in the Garnishment Action, in which Baskin sought assets that Exotic had diverted to other entities. Depo. V.1 at 15:14-16:3; 25:9-27:1 & Depo. Ex. 1 (Evitt Decl. Ex. 3); *see also Big Cat Rescue Corp.*, No. 5:13-FJ-00001 at Dkt. Nos. 131-134; Evitt Decl., ¶¶ 4-5 & Exs. 3-4.

32.     During the course of his 2016 deposition, Sepi admitted: (a) he had been hired by and worked for the Park as a ***videographer***; (b) he had no involvement in the creation of the entity known as Whyte Monkee Productions, LLC, nor any knowledge of that entity's activities, if any, and did not believe himself to be an officer, director, or member of any entity; (c) he did not prepare the LLC paperwork for Whyte Monkee and was not involved in the LLC's formation with the Secretary of State; (d) he had no actual role in the operation, ownership or management of Whyte Monkee Productions, LLC; and (e) he had no entitlement to any funds being held in the name of Whyte Monkee Productions, LLC. *See* ¶¶ 5-6, 16, *supra*, incorporated herein by reference; 2016 Depo. at 134:7-144:23; 154:14-159:12; 167:17-25; 246:11-14; *see also* Depo. V.1. at 110:16-111:14 & Depo. Ex. 4 (Evitt Decl. Ex. 15).

**Sepi's Sham Deposition Testimony in 2021**

33.     At his May 13, 2021 deposition in the instant lawsuit, Sepi initially testified that his testimony in the 2016 deposition was true (Depo. V.1 at 15:14-22; 25:9-27:1 & Depo. Ex. 1 (Evitt Decl. Ex. 3)); but, when confronted with damaging statements from his 2016 deposition, Sepi asserted that he had perjured himself at that earlier deposition. *See, e.g.,* Depo. V.1 at 110:16-112:6 & Depo. Ex. 4 (Evitt Decl. Ex. 15); 115:8-116:20; 120:16-121:22; 127:13-130:22; 136:17-22; 138:18-141:15; Depo. V.2 at 384:12-386:9.

**Royal Goode and the Documentary**

34.     In March 2020, Defendant Netflix, Inc. ("Netflix") released the documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"), which tells the story of Exotic, Baskin, the Park, and the attendant controversies that ultimately led to Exotic's criminal prosecution, arrest, and trial. Chaiklin Decl., ¶¶ 1, 25 & Ex. 1 (submitting Documentary on DVD).

35.     Defendant Royal Goode Productions LLC ("Royal Goode") created the Documentary. Royal Goode licensed film clips from Exotic and Lowe (each of whom owned the Park at one point or another), who each warranted their ownership of the clips. The clips that Royal Goode licensed from the Park's owners (*i.e.*, Exotic and Lowe) include the works at issue in this lawsuit. *Id.*, ¶¶ 1-17, 20-25 & Exs. 1-5.

36.     While creating the Documentary, Royal Goode asked Sepi for his help in locating video clips, which they understood to have been created in the course of Sepi's employment at the Park. *Id.*, ¶¶ 11-14, 18-19 & Exs. 6-7.

10

37.     Royal Goode, without obligation to pay Sepi, variously offered to compensate Sepi for his efforts. *Id.*, ¶ 19 & Ex. 7; Depo. V.1 at 248:10-250:18; Depo. V.2 at 497:20-498:16 & Depo. Ex. 44 (Evitt Decl. Ex. 26).

38.     When Sepi responded to Royal Goode's emails, he did not assert any interest (much less copyright ownership) in any video. Sepi replied, "Your [sic] gonna have to contact joe, I don't ***work there*** anymore." Chaiklin Decl. ¶ 19 & Ex. 7 (emphasis added); Depo. V.2 at 483:7-487:17.

**The Eight Videos at Issue in This Action**

39.     The Videos at issue, brief excerpts of which were allegedly used in the Documentary, are: [1] "Disrespectful Tomato Thrower Trouble"; [2] "Joe-Getting Dragged By Lion"; [3] "Joe – Presidential PSA"; [4] "Mobile Trailer Inspections For Volunteers"; [5] "Country Music Artist Joe Exotic – Bring It On (Please Unite)"; [6] "Joe Exotic Country Music 'Here Kitty Kitty'"; [7] "Joe Exotic TV – Tornado on the Ground"; and [8] "Travis MM Funeral Ceremony." SAC ¶ 20, Ex. 1; Chaiklin Decl., ¶ 23 & Ex. 8; Depo. V.1 at 173:20-174:12 & Depo. Ex. 10 (Evitt Decl. Ex. 17); 176:15-20.

40.     **"Disrespectful Tomato Thrower Trouble"** is an approximately four-minute-and-43-second video published on or about December 4, 2015, which depicts Exotic lecturing Park employees at a Park staff meeting. The Video was filmed on Park premises during the course of a workday, at a staff meeting of the sort Sepi regularly attended as an employee. The Video was made using at least one Canon camera lent to the Park by Sandlin, was edited in the studio, and was used as content for "Joe Exotic TV Live" and uploaded to the *Joe Exotic TV* YouTube channel. Depo. V.2 at 395:14-398:6 &

Depo. Ex. 30 (Evitt Decl. Ex. 10); 400:8-401:16; 402:4-403:5; 403:17-22; *see also* 2016 Depo. at 239:12-240:22; Evitt Decl., Ex. 28 at SEPI000020; *see also* ¶¶ 12, 18, *supra*.

41.    **"Joe-Getting Dragged By Lion"** is an approximately three-minute-and-56-second video filmed in 2016, which begins with Exotic delivering a message for his presidential campaign in an animal cage at the Park. Joe is then dragged by a lion, and he fires his gun. The Video was filmed during Sepi's normal work hours, at the Park, using a Canon camera lent to the Park by Sandlin. Depo. V.2 at 404:22-405:7; 406:9-407:13 & Depo. Ex. 31 (Evitt Decl. Ex. 11); 410:6-19; 412:16-413:9; Evitt Decl., Ex. 28 at SEPI000023-24; *see also* ¶¶ 12, 22-23, *supra*.

42.    **"Joe – Presidential PSA"** is an approximately four-minute-and-five-second video featuring Exotic that was filmed in 2015 for Exotic's presidential campaign. The video footage was filmed during the day outside the studio at the Park, on a day Sepi was working at the Park, and a resulting video using part of the footage was made available on the *Joe Exotic TV* YouTube channel. Depo. V.2 at 381:7-382:18 & Depo. Ex. 29 (Evitt Decl. Ex. 9); 383:13-384:1; 386:10-20; 388:3-19; 392:15-393:15; Evitt Decl., Ex. 28 at SEPI000025; *see also* ¶¶ 12, 22-23, *supra*.

43.    **"Mobile Trailer Inspections For Volunteers"** is an approximately ten-minute-and-50-second video filmed in 2016 of inspections of employee trailers conducted on the Park premises. Sepi appears in the Video wearing his green Park shirt and his Park walkie-talkie. The Video was filmed during Sepi's normal work hours at the Park, using a Canon camera lent to the Park by Sandlin. Sepi showed such footage to Exotic when it revealed employee drug or alcohol use so that Exotic could address it.

Depo. V.2 at 414:4-415:20 & Depo. Ex. 32 (Evitt Decl. Ex. 12); *id.* at 416:2-20; 418:19-419:19; 422:11-423:1; Evitt Decl., Ex. 28 at SEPI000027-28; *see also id.* at 372:14-373:5; 481:6-21 & Depo. Ex. 43 (Evitt Decl. Ex. 25); ¶ 12, *supra*.

44.     **"Country Music Artist Joe Exotic – Bring It On (Please Unite)"** is an approximately four-minute-and-41-second music video published on or about October 1, 2015 about the controversies surrounding Exotic and the Park. The Video was filmed during Sepi's normal work hours, at the Park, using several cameras including a Canon loaned to the Park by Sandlin, was edited in the studio, and was made available on YouTube and for purchase on a CD/DVD combo pack sold at the Park's gift shop. Depo. V.2 at 308:3-20; 313:6-314:22 & Depo. Exs. 21-22 (Evitt Decl. Exs. 7, 21); 322:7-323:5; 327:4-18; 332:14-333:15 & Depo. Ex. 13 (Evitt Decl. Ex. 18); 334:3-13; 335:2-16; 337:11-20; 346:5-13 & Depo. Ex. 25 (Evitt Decl. Ex. 22); *see also* ¶¶ 12, 18 *supra*.

45.     **"Joe Exotic Country Music 'Here Kitty Kitty'"** is an approximately four-minute-and-48-second music video published on or about September 17, 2015 about the disappearance of Baskin's husband, featuring Exotic and a Baskin look-alike. The Video was filmed during Sepi's normal work hours, at the Park, was edited in the studio, and also was made available on YouTube and for purchase on a CD/DVD combo pack sold at the Park's gift shop. Depo. V.1 at 180:18-181:5; 185:19-187:6 & Depo. Ex. 12 (Evitt Decl. Ex. 6); 188:2-19; 198:19-203:11 & Depo. Ex. 13 (Evitt Decl. Ex. 18); 221:17-227:18 & Depo. Ex. 15 (Evitt Decl. Ex. 19); 231:15-234:20; 235:18-236:15; 238:8-239:15 & Depo. Ex. 17 (Evitt Decl. Ex. 20); *see also* ¶¶ 12, 18 *supra*.

46.     **"Joe Exotic TV – Tornado on the Ground"** is an approximately 21-minute-and-56-second video published on or about May 9, 2016 of a tornado occurring outside the Park's grounds, which was live-streamed as an episode of *Joe Exotic TV* on the *Joe Exotic TV* YouTube channel, where it remained afterward. Exotic appears in the video, whose caption reads "Tornado touching down just 3 miles way [sic] from The Greater Wynnewood Exotic Animal Park and its [sic] all caught on camera. Joe Exotic reporting on scene." The Video was filmed during Sepi's normal work hours at the Park, using a Canon camera that was loaned to the Park by Sandlin. Depo. V.2 at 354:3- 358:5 & Depo. Ex. 26 (Evitt Decl. Ex. 23); 359:18-360:2 & Depo. Ex. 27 (Evitt Decl. Ex. 8); 360:24-362:13; Evitt Decl., Ex. 28 at SEPI000026; *see also* ¶¶ 12, 18 *supra*.

47.     **"Travis MM Funeral Ceremony"** (the "Funeral Video"), is an approximately 23-minute-and-52-second video published on or about October 14, 2017 of Travis Maldonado's funeral, which took place on the Park's premises. After leaving the Park in 2016, Sepi returned to the Park to attend and film Travis's funeral because he believed that is what Travis would have wanted. Depo. V.2 at 425:11-426:15. Sepi filmed using a Canon camera that Sandlin lent to the Park and did no editing. Sepi put the camera on a tripod, sat down, and left the camera running. The footage was livestreamed through the *Joe Exotic TV* YouTube page, where it remained afterward. Depo. V.2 at 423:19-421:25 & Depo. Ex. 33 (Evitt Decl. Ex. 13); 427:15-428:3; 432:15-433:20; 434:4-14; 440:11-15 & Depo. Ex. 35 (Evitt Decl. Ex. 24); *see also* ¶ 12 *supra*.

48.     Whyte Monkee claims ownership of five videos and Sepi claims ownership of three videos. SAC, ¶¶ 15-16, 20 & Ex. 1.

49.     Six of the eight Videos appear for less than 30 seconds in the Documentary; the Funeral Video appears in a one-minute-and-six-second segment, over half of which is actually other material. Chaiklin Decl., Ex. 1; *see also id.*, ¶ 23 & Ex. 8; SAC, Ex. 1.

50.     The Videos were registered with the U.S. Copyright Office in 2020, after the Documentary had debuted on Netflix. Chaiklin Decl., ¶ 25; Depo. V.1 at 221:17-227:18 & Depo. Ex. 15 (Evitt Decl. Ex. 19); Sepi Depo V.2 at 346:5-13 & Depo. Ex. 25 (Evitt Decl. Ex. 22); 440:11-15 & Depo. Ex. 35 (Evitt Decl. Ex. 24); Evitt Decl., Ex. 28 at SEPI000020; SEPI000023-28.

51.     Sepi has never licensed, sold, or otherwise commercially exploited any of his work (including the Videos). Resp. to Interrog. (Evitt Decl. Ex. 5) at Nos. 7-10; *see also* Depo. V.1 at 105:14-106:16; 193:7-194:8, 230:10-231:14, 240:8-12; 265:16-21; Depo. V.2 at 335:14-336:19; 337:8-338:1, 349:18-352:20.

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)); *Fields v. Baseline Properties, LLC,* 2020 WL 10790293, at *1 (W.D. Okla. July 10, 2020) (DeGuisti, J.). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

On summary judgment, the Court views the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant meets that burden, the nonmovant must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671; *see also* Fed. R. Civ. P. 56(c)(1)(A). If a party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## SHAM AFFIDAVIT DOCTRINE

While "an affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements … courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Law Co., Inc. v. Mohawk Const. and Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). The sham affidavit doctrine "is not limited to affidavits filed in connection with summary judgment papers that contradict earlier deposition testimony, and has been extended to preclude later deposition testimony that contradicts earlier sworn statements." *Hernandez v. City of*

*Napa*, 2010 WL 4010030, *8 (N.D. Cal. Oct. 13, 2010).[4] "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks v. Nimmo*. 796 F.2d 1230, 1237 (10th Cir. 1986).

## ARGUMENT

### I.   Plaintiffs Cannot Establish the Requisite Ownership or Originality.

To prevail, Plaintiffs must show (1) they own a valid copyright, and (2) defendants copied constituent elements of the work that are original to Plaintiffs. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008) (Gorsuch, J.). Here, as to all but one of the Videos, Plaintiffs cannot establish ownership. As to the remaining Video, the Funeral Video, Plaintiffs cannot show originality.

### A.   The Park Owned the Copyrights as "Works Made for Hire."

Because copyright ownership "vests initially in the author or authors of the work" (17 U.S.C. § 201(a)), proof of copyright ownership typically requires that a plaintiff be the "author." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). "As a

---

[4] *See also Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir. 2006) (where plaintiff failed to mention alleged discriminatory remark during two years of administrative procedure, mention of alleged remark in a later deposition was a sham); *Burns v. Board of County Com'rs of Jackson Cnty.*, 330 F.3d 1275 (10th Cir. 2003) (doctrine applies not only to affidavits but also to sham Fed. R. Civ. P. 30(e) corrections); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162 (7th Cir. 1996) (doctrine applies to contradiction of sworn testimony in a previous hearing); *Essick v. Yellow Freight Sys, Inc.*, 965 F.2d 334 (7th Cir. 1992) (same).

general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Id.* (citing 17 U.S.C. § 102); *Huebbe v. Okla. Casting Co.*, 663 F. Supp. 2d 1196, 1201-02 (W.D. Okla. 2009) (DeGiusti, J.) (same). However, "in the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Huebbe*, 663 F. Supp. 2d at 1202 (quoting 17 U.S.C. § 201(b)).

As defined in 17 U.S.C. § 101, a work is "for hire" if it constitutes "a work prepared by an employee within the scope of his or her employment[.]" Here, the evidence is undisputed that Sepi was a Park employee when he filmed the Videos (except the Funeral Video, which is discussed *infra* at pp. 24-25), and that he filmed the Videos in the scope of his employment. Plaintiffs thus cannot show copyright ownership.

### 1.   Sepi Acted Within the Scope of His Employment.

Common law agency principles govern whether a work was created within the scope of employment. *See Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994); *Reid*, 490 U.S. at 739 (citing Restatement (Second) of Agency § 228 (1958)). "As expressed in Section 228 of the Restatement [of Agency], the key principle is that a servant's conduct is within the scope of employment 'only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.'" *Avtec*, 21 F.3d at 571. To qualify as the kind of work an employee was employed to perform, a

task need only be "fairly and reasonably incidental to his employment[.]" *Vanderhurst v. Colo. Mountain Coll. Dist*., 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998); *see also Fleurimond v. New York Univ*., 876 F. Supp. 2d 190, 204 (E.D.N.Y. 2012) ("acts incidental to authorized acts may be authorized as within the scope of employment") (citing Restatement (Second) of Agency); *Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238, 1243 (D.S.C. 1992) (same).

Courts in copyright infringement cases frequently grant summary judgment where no factual issue exists that a plaintiff acted within the scope of employment such that the work was a work made for hire. *See, e.g., Vanderhurst*, 16 F. Supp. 2d at 1307; *Rouse v. Walter & Assocs., LLC*, 513 F. Supp. 2d 1041 (S.D. Iowa 2007); *Fleurimond*, 876 F. Supp. 2d at 190; *Lewis v. Activision*, 2013 WL 5663103 (N.D. Cal. Oct. 17, 2013), *aff'd*, 634 F. App'x 182 (9th Cir. 2015); *Carol Wilson Fine Arts, Inc. v. Zifen Qian*, 71 F. Supp. 3d 1151 (D. Ore. 2014); *Genzmer v. Pub. Health Trust of Miami-Dade Cnty.*, 219 F. Supp. 2d 1275 (S.D. Fla. 2002); *Miller*, 808 F. Supp. 1238. Here, Sepi filmed the Videos within the scope of his employment.

*First*, Sepi testified during his 2016 deposition that videography was precisely the job he was hired to perform. *See, e.g.,* 2016 Depo. at 74:16-17 ("I approached Joe and asked him if he really needed another cameraperson. . . . So I guess he hired me to do that and that was that."). This testimony from the Garnishment Action—in which Sepi was a third party without any incentive to lie—is dispositive as to whether Sepi filmed the Videos within the scope of his employment.

At his 2021 deposition in this case, Sepi did not initially dispute his 2016 testimony. Depo. V.1 at 23:12-20. Only after he realized that his 2016 testimony devastated his claims in this action did he change his testimony and contend that he committed perjury in his 2016 deposition. Unlike in his 2016 deposition, however, when he had no incentive to lie, he had a clear incentive to lie during his 2021 deposition.

Sepi's perjurious attempt to repudiate his 2016 testimony cannot stand under the sham affidavit doctrine. He was cross-examined during his 2016 deposition. He obviously had access to, and fresh recollection of, the relevant evidence, namely his own job responsibilities. And he showed no confusion whatsoever over a simple fact—what he had done for a living since March of 2015. Moreover, other than claiming that he perjured himself at his 2016 deposition because he feared for his life—a claim that has no support in fact or logic[5]—Sepi has never explained why he would lie about his job responsibilities in 2016.[6] *See* Depo. V.1 at 128:20-129:19; 140:14-141:15. The sham affidavit doctrine thus bars Sepi from now claiming that he was ***not*** hired as a videographer. *See Franks*, 796 F.2d at 1237.

---

[5] Sepi's asserted "reason" for perjuring himself in 2016 (*i.e.*, because he was afraid of Exotic) is nonsensical. Sepi's 2016 testimony ***harmed*** Exotic's position in the Garnishment Action by demonstrating that Whyte Monkee was a company created under false pretenses, in which Sepi had no actual role. *See* ¶ 32, *supra.* In a separate action for successor liability brought against the Park in this District, the parties had already stipulated that the Park had engaged in an illegal fraudulent transfer by creating a new entity in an attempt to evade Baskin's judgment. *See Big Cat Rescue Corp. v. G.W. Exotic Animal Mem'l Found.*, 2016 WL 407314 (W.D. Okla. Feb. 2, 2016).

[6] Later in his 2021 deposition, Sepi changed his story again and said he perjured himself because he wanted to keep copies of his videos, again nonsensical given his testimony against Exotic's interests. *See* Depo. V.1 at 138:18-141:15.

But even ignoring the perjury charade and fully crediting Sepi's more recent testimony, it is still undisputed that Sepi acted within the scope of his employment in filming the Videos. Even if, as he now claims, he was hired to take still photography, that job (as he readily admits) is closely related to videography and involves overlapping skills. Sepi even used the same equipment for photography and videography. *See, e.g.,* Depo. V.1 at 212 ("Q. And what did you learn in the camera operation class?  A. How to operate a camera and take photos and video. Q. Both still photos and videos?  A. Yeah, camera operation. It's all in one.").

Courts in copyright cases have found that a work was made for hire (and thus owned by the employer) where an employee's tasks were far less related to the work's creation than here. In *Fleurimond*, plaintiff, a graphic designer employed to create promotional materials for the NYU Athletic Department, created a caricatured drawing of a cougar mascot that NYU used and sold on various university-branded items. 876 F. Supp. 2d 190. In asserting copyright ownership, plaintiff claimed that the mascot's creation occurred outside the scope of her employment because the drawing was more "artistic" than her "technical" job. *Id.* at 204. Because of the overlapping skills required, the court granted summary judgment, finding the defendant had met its burden of showing that the mascot design project generally, and the creation of the mascot specifically, were within the scope of the plaintiff's employment. *Id.* at 209-10; *see also Carol Wilson Fine Arts*, 71 F. Supp. 3d 1151 (where employee's job was to create original artwork for use in greeting cards and stationary, paintings made during the time of employment were works made for hire such that summary judgment was appropriate);

*Lewis*, 2013 WL 5663103 (where plaintiff was employed as a "Game Master," a sort of customer service role in which she answered customers' questions and offered assistance with various aspects of the game, her voicing of a video game character was within the scope of employment such that summary judgment was warranted).[7]

**Second**, under the second Restatement factor, Sepi filmed the videos substantially within the authorized time and space limits of his job. He admits he filmed all the Videos (except the later-made Funeral Video) during his normal work hours at the Park and primarily on Park grounds. Moreover, Sepi edited the Videos on Park grounds, at the Park's studio, using equipment that, after the fire in 2016, Sandlin (from "Tiger Truck Stop") had lent to the Park. The Videos show Sepi wearing his Park work shirt and carrying a Park walkie-talkie while filming was taking place.

**Third**, Sepi's videography was "actuated, at least in part, by a purpose to serve the master." *Avtec*, 21 F.3d at 571. Sepi testified that he filmed the Videos "to basically promote what the cause of the ***foundation of the nonprofit*** was doing, and that was to care for animals that were a species that was dying in the wild…" (emphasis added). *See*

---

[7] *See also Miller*, 808 F. Supp. at 1243 (granting summary judgment; where plaintiff employed as a laboratory supervisor wrote computer programs calculating required adjustments to defendant's products, largely on his own time, the programs were works made for hire because their development "was at least incidental to his job responsibilities" at the laboratory); *Vanderhurst*, 16 F. Supp. 2d at 1307 (granting summary judgment; professor's creation of "Veterinary Technology Outline" using own materials and own time was work made for hire where doing so was "fairly and reasonably incidental to his employment" and could be "regarded fairly as one method of carrying out [its] objectives"); *Rouse*, 513 F. Supp. 2d at 1057-61, 1070 (granting summary judgment; no genuine issue of fact as to whether computer program created by university professors was work made for hire in which they did not have copyright ownership, and thus they could not assert standing as to copyright infringement claim).

¶ 24, *supra*. He agreed that he wanted to benefit Exotic, and testified that his goal in filming was always to make Exotic "look good." *See* ¶ 26, *supra*. Sepi also admitted that he filmed the Videos to provide publicity for the Park. *See* ¶ 25, *supra*. Sepi thus conceded that the Videos served his employer, namely the Park. The Videos on their face confirm this. All three Restatement factors establish that Sepi filmed seven of the eight Videos within the scope of his employment. Those Videos are works made for hire, Plaintiffs do not own them, and Plaintiffs do not have standing to sue on them.

### 2. Plaintiffs Could Not Own the Videos by Oral Agreement.

Plaintiffs contend that the Park—Exotic or members of the Park's board—orally agreed that Whyte Monkee or Sepi would own the copyright in the Videos. *See, e.g.*, SAC ¶¶ 10, 12-13, Resp. to Interrog. (Evitt Decl. Ex. 5) Nos. 1-2, 16.[8] Where, as here, a work is made for hire, "the employer or other person for whom the work was prepared is considered the author ... and, ***unless the parties have expressly agreed otherwise in a written instrument signed by them***, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b) (emphasis added). Moreover, both parties must execute the written agreement ***before*** the creation of the work. *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 412-13 (7th Cir. 1992); *Gladwell Gov't Servs., Inc. v. Cnty. of Marin,* 265 F. App'x 624, 626 (9th Cir. 2008). Plaintiffs admit that no such written agreement exists regarding copyright ownership. *See* ¶ 8, *supra*. Plaintiffs do not own the copyrights.

---

[8] Sepi testified in 2016 that he had no actual role in the formation, management, or ownership of any Whyte Monkee entity created under his name. *See* ¶ 32, *supra*.

**B.      The Funeral Video is Not Original.**

Plaintiffs must also show that their works are original. To satisfy the originality

requirement, the work must "possesses at least some minimal degree of creativity." *Feist*

*Publ., Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 345 (1991); *see also* 2 Patry

on Copyright § 3:27 ("both independent creation *and* a minimal degree of creativity are

required"). The Tenth Circuit's decision in *Meshwerks* is instructive. In that case, then-

Judge Gorsuch considered whether digital models—which the court characterized as

computerized substitutes for product photographs—were sufficiently original to receive

copyright protection. 528 F.3d at 1260. The court noted that "the photographer is entitled

to copyright solely based on lighting, angle, perspective, and the other ingredients that

traditionally apply to that art-form." *Id*. at 1265 (quoting Nimmer on Copyright

§ 3.03[C][3]). But the photographer may not claim copyright in the subject of the

photograph, or of a photograph made without any original contributions at all. *Id., see*

*also President and Fellows of Harvard College v. Elmore*, 2016 WL 7494274, at *9 (D.

N. Mex. May 19, 2016) (photograph of a jar taken in assessing a university museum's

collection was not protectable by copyright where there was "no evidence of intentional

decision-making" and "no evidence that the photographer intended to achieve any

purpose other than to record the condition of the artifact depicted."); *Oriental Art*

*Printing, Inc. v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 546 (S.D.N.Y. 2001)

(photographs of food in Chinese restaurant menu were not copyrightable because no

"'creative spark' was required to produce them.").

In filming the Funeral Video, Sepi made no decisions on the ingredients that traditionally apply to the art form of motion picture making. Rather, he set up a camera on a tripod, sat down, and left the camera running. The Funeral Video is not original.

## II.  Defendants' Use of the Videos in the Documentary Was Fair Use.

Even if Plaintiffs could establish copyright ownership, Defendants' use of the Videos in the Documentary was quintessential fair use. A court determines whether a use is fair based on a four-factor test, which should apply separately to each of the Videos at issue: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the market for or the value of the original. 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576-77 (1994); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1258 (11th Cir. 2014). The four factors are weighed together, in light of the purposes of the Copyright Act (*Campbell*, 510 U.S. at 578); all four factors need not favor the defendant for a finding of fair use, including on summary judgment. *Kelly v. Arriba Soft. Corp.*, 336 F.3d 811, 818 (9th Cir. 2003).

### A.   Factor 1*: The Documentary is Highly Transformative.

The key inquiry under the first fair use factor is whether the new work is "transformative," *i.e.*, whether it "'add[s] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (quoting *Campbell*, 510 U.S. at 579). Where "the quoted matter is used as ***raw material***, transformed in the creation of new information, new

aesthetics, new insights and understandings—this is the very type of activity that the fair

use doctrine intends to protect for the enrichment of society." *Seltzer v. Green Day, Inc.*,

725 F.3d 1170, 1176 (9th Cir. 2013) (emphasis added) (quoting Judge Pierre Leval,

*Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)); *Blanch v. Koons*,

467 F.3d 244, 251-52 (2d Cir. 2006) (same). "[A]n allegedly infringing work is typically

viewed as transformative as long as new expressive content or message is apparent."

*Seltzer*, 725 F.3d at 1177. Where a use is transformative, the commercial value of the

defendant's work is "of little significance." *SOFA Ent., Inc.*, 709 F.3d at 1278-79; *Cariou

v. Prince*, 714 F.3d 694, 708 (2d. Cir. 2013) (same). Where the defendant's work fits a

use identified in Section 107, like criticism or comment, "there is a strong presumption

that factor one favors the defendant[.]" *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d

Cir. 2004); *see Brown v. Netflix*, 855 F. App'x 61, 62-63 (2d Cir. 2021) (documentary).

Courts thus routinely find the use of copyrighted material in documentaries to be

transformative. In *Brown v. Netflix*, the Second Circuit affirmed that use of a copyrighted

children's song about fish sticks in a documentary film about burlesque (during a

performance involving a fish costume) was fair, and that there was a presumption of fair

use under the first factor because the film was of a "documentary character[.]" 855 F.

App'x at 62-63.[9] Likewise, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, use of

Grateful Dead event posters in a historical book about the band was transformative

---

[9] The district court in the same case reasoned, "while Defendants do not alter the Song … the performance serves a new and different function from the Song, rather than offering merely a substitute for its tale." *Brown v. Netflix, Inc.*, 462 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (internal quotations omitted).

because the posters served as "historical artifacts," differing from their original "dual

purposes of artistic expression and promotion." 448 F.3d 605, 609-11 (2d Cir. 2006).[10]

Like the documentary in *Brown,* the Documentary is "criticism" and "comment."

The Documentary's use of brief excerpts from other works as reference points is

therefore entitled to a presumption of fair use. The Documentary is also highly

transformative of the Videos, which serve as raw materials and historical markers in a

way entirely different from their original function. The Videos are physically transformed

through the Documentary's use of short excerpts, which are interspersed with interviews

or accompanied by voiceovers that change the Videos' meaning. *See* Chaiklin Decl.,

Exhibits 1, 8. Whereas the Videos were created to promote Exotic and the Park and to

feed Exotic's ego—whether in the form of *Joe Exotic TV*, music videos, political

campaigns, or the documentation of everyday life at the Park—in the Documentary, the

Videos serve to comment upon and criticize Exotic and his increasingly edgy behavior.

*See id.* Furthermore, whereas the Videos focus primarily on Exotic and reflect, without

irony, the egocentric worldview of a self-declared "Tiger King," the Documentary treats

Exotic and the Park as studies in character and society, giving voice to the other

---

[10] *See also, e.g., Red Label Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 985 (N.D. Ill. 2019) (use of excerpts of plaintiffs' "Super Bowl Shuffle" video in documentary about the 1985 Chicago Bears was transformative where it served as historical guidepost "within a video[] that construct[s] new narratives about the history of the [Bears] and the NFL") (citing *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 940 (4th Cir. 2013)); *SOFA Ent.*, at 1278-79 (use of a seven-second clip from the band The Four Season's appearance on *The Ed Sullivan Show*—a turning point in the band's career—in a musical about The Four Seasons was transformative: "[b]y using [the clip] as a biographical anchor, [defendant] put the clip to its own transformative ends.").

individuals who played a role in the Park and in the surrounding controversies that culminated in Exotic's downfall. *See id.* The first factor heavily favors Defendants.

### B.     Factor 2: The Videos are Primarily Factual and Published.

The second factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2). "The scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." *Hustler Mag., Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153-54 (9th Cir. 1986). Many of the Videos are factual, consisting of footage of actual events with little to no creative input. *See, e.g.,* "Tornado on the Ground," "Travis MM Funeral Ceremony," "Disrespectful Tomato Thrower Trouble," "Mobile Trailer Inspections For Volunteers." Many of the Videos were already published on *Joe Exotic TV* or elsewhere. *See* ¶¶ 40, 42, 44-47, *supra*. In any event, courts have held that "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612.

### C.     Factor 3: The Amount of Use Weighs in Favor of Defendants.

The third factor looks to the "quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178. This factor necessarily overlaps somewhat with the first factor—the "extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. "If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly*, 336 F.3d at 820-21. Moreover, "[t]he fair use doctrine does not obligate the Film to use the shortest possible snippet to convey its message of commentary and criticism." *Brown*, 855 F.

App'x at 64. Even where a defendant uses an entire work, the third factor may weigh in its favor. *Seltzer*, 725 F.3d at 1178; *Bill Graham Archives*, 448 F.3d at 613.

The Documentary uses a quantitatively insubstantial amount of footage from each Video. Indeed, less than 17% of any Video allegedly appeared in the Documentary. Across all seven episodes of the approximately 319-minute Documentary, the time allegedly used from any one Video ranges from a dozen seconds to just over a minute. *See* Chaiklin Decl., Exhibit 1, ¶ 49, *supra*. Qualitatively, Defendants used no more than necessary—and what they did use was reasonable in light of their purposes of providing historical reference points and creating a captivating viewing experience that would bring Exotic's unusual story to life. *See Red Label Music Publ'g*, 388 F. Supp. 3d at 986; *Threshold Media v Corp. v. Relativity Media, LLC*, 2013 WL 12331550 at *12 (C.D. Cal. Mar. 19, 2013) ("Although one might quibble whether the filmmakers could have cut a second or two from their uses of [plaintiff's] song in order to further reduce its overall exposure, the overall amount used was reasonable in light of their purpose.").

### D.    Factor 4: There Is No Genuine Issue of Fact as to Market Harm.

The fourth factor asks what effect the allegedly infringing use has on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "[W]here a work is transformative, market harm may not so readily be inferred and there is no presumption of market harm." *See Weinberg v. Dirty World, LLC*, 2017 WL 5665023 at *12 (C.D. Cal. July 27, 2017). In evaluating the fourth factor, a court should assess harm to the plaintiff's "traditional, reasonable, or likely to be developed markets." *Seltzer*, 725 F.3d at 1179 (citation omitted); *American Geophysical Union v. Texaco Inc.*, 60 F.3d

913, 930 (2d Cir. 1994) (same). Where, as here, the allegedly infringing use does not substitute for the original and serves a different market function, the fourth factor weighs in favor of fair use. *See Campbell*, 510 U.S. at 591.

The fourth factor weighs in the defendant's favor when the plaintiff provides no evidence demonstrating a market impact. *Norse v. Henry Holt & Co.*, 847 F. Supp. 142, 147 (N.D. Cal. 1994) (where defendant copied only small portions of plaintiff's letters, "plaintiff has provided no evidence of a valuable market, particularly in light of the sparsity and content of the copied material"); *Calkins v. Playboy Enters. Int'l, Inc.*, 561 F. Supp. 2d 1136, 1143-44 (E.D. Cal. 2008) (fourth factor favored defendant where "there is no evidence before the Court demonstrating that [defendant]'s use of the Photograph interfered in any way with the marketability of the work").

The Documentary's use of the short film clips did not harm any purported market for licensing the Videos. Sepi has never licensed, sold, or otherwise commercially exploited ***any*** of his work (including the Videos). *See* ¶ 51, *supra*. As to each individual Video, the clips and photos "were 'too few, too short, and too small in relation to the whole' to undercut the market for plaintiff's copyrighted works.'" *Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442, 449 (S.D.N.Y. 2001) (quoting *Hofheinz v. AMC Productions, Inc.*, 147 F. Supp. 2d 127, 140 (E.D.N.Y. 2001)). To the extent that the Court deems it necessary to reach the issue, all four fair use factors weigh in Defendants' favor, and summary judgment is warranted on this independent ground.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment.

DATED:  January 27, 2022                    Respectfully submitted,

By: /s/ Robert H. Rotstein
    Robert H. Rotstein (CA Bar # 72452)
      Admitted *Pro Hac Vice*
    Emily F. Evitt (CA Bar # 261491)
      Admitted *Pro Hac Vice*
    MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 1-8th Floor
    Los Angeles, CA  90067-3120
    (310) 312-2000 – Telephone
    (310) 312-3100 – Facsimile
    rxr@msk.com
    efe@msk.com


    Mack J. Morgan III, OBA #6397
    Anton J. Rupert, OBA #7827
    Geren T. Steiner, OBA #18845
    **RUPERT STEINER & MORGAN, PLLC**
    14001 Quail Springs Parkway
    Oklahoma City, OK 73134
    (405) 607-1494
    (405) 607-1450 (Facsimile)
    mack@rsm-law.com
    tony@rsm-law.com
    geren@rsm-law.com

    Attorneys for Defendants, Netflix, Inc.,
    and Royal Goode Productions LLC