# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

WHYTE MONKEE PRODUCTIONS,  )
LLC, and                    )
TIMOTHY SEPI,               )
                            )
    Plaintiffs,            )
                            )
v.                          )    Case No. CIV-20-933-D
                            )
NETFLIX, INC., and          )
ROYAL GOODE PRODUCTIONS, LLC,  )
                            )
    Defendants.            )

## ORDER

In March 2020, Defendant Netflix, Inc. released *Tiger King: Murder, Mayhem and Madness*, a seven-part documentary series that was produced by Defendant Royal Goode Productions, LLC. As anyone who has watched *Tiger King* can attest, its subtitle is not hyperbole. The series features several individuals who own tigers and other exotic animals, but mainly focuses on the Tiger King himself – Joe Exotic – and his acrimonious rivalry with self-styled animal activist Carol Baskin. The rivalry takes a turn for the worse, and by the end of the series, Exotic has been arrested for his involvement in a murder-for-hire plot directed at Ms. Baskin.

Included in the series at various points are short clips from eight videos filmed by Plaintiff Timothy Sepi and purportedly produced by Plaintiff Whyte Monkee Productions, LLC. With one exception, all the videos were filmed while Mr. Sepi was working at Exotic's home base – the Gerald Wayne Interactive Zoological Park. Following the release of *Tiger King*, Mr. Sepi registered the videos for copyright protection, either under his own

name or the name of Whyte Monkee Productions. Plaintiffs then sued Netflix and Royal Goode for copyright infringement, contending that the videos were used without their permission.

Defendants have moved for summary judgment [Doc. No. 46] on this claim, arguing that seven of the videos are not owned by Plaintiffs because they were made within the scope of Mr. Sepi's employment, and the remaining video is not subject to copyright protection because it is lacking in originality. Alternatively, Defendants argue that their use of the videos qualifies as a fair use such that no copyright infringement occurred. Plaintiffs have responded in opposition [Doc. No. 55] and Defendants have replied [Doc. No. 56]. For the reasons explained below, the Court finds that Defendants are entitled to summary judgment because seven of the videos are works for hire that are not owned by Plaintiffs, and the use of the remaining video was a fair use.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.*

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). Although "[t]he court need consider only the cited materials," it may also "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The key inquiry is whether the facts and evidence present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## UNDISPUTED MATERIAL FACTS

Joe Exotic, also known as Joseph Maldonado-Passage or Joseph Allen Schreibvogel, founded the Gerald Wayne Interactive Zoological Park in Wynnewood, Oklahoma. Defs.' Stmt. Undisp. Facts ¶ 1. The Park housed tigers, lions, and other exotic animals and was open to the public for tours. *See* Pls.' Br., Ex. 1 to Chaiklin Dec. [Doc. No. 46-26]. There was also a studio on park grounds, which was used to produce a web series called *Joe Exotic TV*. Def.'s Stmt. Undisp. Facts ¶¶ 2, 19. *Joe Exotic TV* was primarily an unscripted series featuring video footage from around the Park and skits invented by Exotic. *Id*.

In early 2015, *Joe Exotic TV* was produced by Rick Kirkham, who oversaw the studio operations and a team of four people. *Id*. at ¶ 4. In March 2015, Mr. Sepi was hired to work with Mr. Kirkham as a cameraperson. *Id*. at ¶ 5; Pls.' Add. Material Facts ¶ 54-55.

At the time of his hiring, Mr. Sepi understood that his job duties would include taking photographs of Park tours and working on *Joe Exotic TV*, that he would be paid $150 per week, and that he could live on Park property for free. Defs.' Stmt. Undisp. Facts ¶¶ 5-6; Pls.' Add. Material Facts ¶ 54-55. Although initially unclear about who was actually employing him, Mr. Sepi came to understand that he was working for the Park. Sepi Depo 2016 at 109:11-20 [Doc. No. 46-3]. Only a week after starting his employment, a fire destroyed the Park's studio and camera equipment. *Id.* at ¶¶ 10, 13. Mr. Kirkham and his crew promptly quit, and Mr. Sepi was left as the sole videographer at the Park. *Id.*

With the studio and camera equipment destroyed, *Joe Exotic TV* went on hiatus. *Id.* at ¶ 11. During this time, Mr. Sepi continued to photograph park tours and assisted with animal care around the Park. *Id.*; Pls.' Add. Material Facts ¶ 57. But this was only a temporary situation. Within a couple of months, a new production studio had been built, new camera equipment obtained, and *Joe Exotic TV* was back in production. Defs.' Stmt. Undisp. Facts ¶¶ 12-13. The new equipment was procured from Michael Sandlin, a *Joe Exotic TV* sponsor and the owner of a facility known as the Tiger Truck Stop. *Id.* at ¶ 12; Pls.' Add. Material Facts ¶ 63. Mr. Sepi did not make the arrangements to obtain the new equipment, but it was made available for his use. Defs.' Stmt. Undisp. Facts ¶ 12.

Using this new equipment, Mr. Sepi spent his workdays taking tour photographs, filming and editing *Joe Exotic TV*, filming campaign videos for Exotic (who ran for governor and president), filming music videos featuring Exotic, and filming the day-to-day operations of the Park. Defs.' Stmt. Undisp. Facts ¶ 17; Pls.' Response ¶ 17. Mr. Sepi filmed and produced the videos to provide publicity for the Park, to benefit Exotic, and to

promote the cause of the nonprofit that operated the Park. Defs.' Stmt. Undisp. Facts ¶¶ 24-26. Mr. Sepi admits that during this time frame, he was an employee of the Park, made $150 per week, lived rent-free on Park premises, and used the Park's studio and equipment, although he disputes that all the videography work he performed was done in the scope of his employment. Defs.' Stmt. Undisp. Facts ¶¶ 9,13; Pls.' Add. Material Facts ¶¶ 17, 63; Sepi Depo 2021 at 51:2-3 [Doc. No. 55-1].

Following the studio fire, *Joe Exotic TV* returned to streaming on May 7, 2015. Defs.' Stmt. Undisp. Facts ¶ 14. Each episode was preceded by a "disclaimer" stating that the footage is owned by Whyte Monkee Productions. Pls.' Add. Material Facts at ¶ 64. Whyte Monkee Productions is an Oklahoma limited liability company that was established on May 5, 2015. Defs.' Stmt. Undisp. Facts ¶ 16; Pls.' Add. Material Facts ¶ 59. The Articles of Organization include Exotic's email address, the Park's street address, and "Tim Sepi" as the signatory. Defs.' Stmt.  Undisp. Facts ¶ 16. During the May 7th episode of *Joe Exotic TV*, Exotic referenced the newly formed Whyte Monkee Productions by stating "they can take a lot away from me, but they can't take my freedom of speech, and since this is all Whyte Monkee Productions and has nothing to do with us other than I'm the pretty face sittin' right here, I can say F--- you Carole Baskin." Pls.' Add. Material Facts ¶ 55.

Around February 2016, ownership of the Park was transferred to an entity owned by Jeffrey Lowe and it was renamed the Greater Wynnewood Exotic Animal Park. Defs.' Stmt. Undisp. Facts ¶ 28. Despite the change in ownership, Exotic continued to work as the Park's entertainment director and Mr. Sepi continued to film and produce videos

featuring Exotic. *Id.* at ¶¶ 28-30; Sepi Depo 2016 at 214:3-215:1. In August 2016, Mr. Sepi quit so that he could pursue his photography and get paid more than $150 per week. Sepi Depo 2016 at 189:6-13.

During and after Mr. Sepi's tenure at the Park, filmmakers associated with Defendant Royal Goode were shooting footage at the Park and editing what would eventually become the *Tiger King* series. Chaiklin Dec. ¶¶ 10-11. In addition to its own footage, Royal Goode licensed film clips from Exotic and Lowe, including the works that Plaintiffs now claim to own. Defs.' Stmt. Undisp. Facts ¶ 35. In January 2018, while creating *Tiger King*, one of the filmmakers emailed Mr. Sepi to obtain his assistance in accessing video footage that was apparently located at the Park. *Id.* at ¶ 36-38; Ex. 7 to Chaiklin Dec [Doc. No. 46-32]. Mr. Sepi responded by telling the filmmakers to contact Exotic because he did not work there anymore. *Id.* He did not assert any ownership interest in the footage at that time. *Id.*

*Tiger King* was released by Netflix in March 2020 and includes clips from the following videos that were filmed while Mr. Sepi was an employee of the Park:

- Disrespectful Tomato Thrower Trouble
- Joe-Getting Dragged by a Lion, Joe – Presidential PSA
- Mobile Trailer Inspections for Volunteers
- Country Music Artist Joe Exotic – Bring It On (Please Unite)
- Joe Exotic Country Music 'Here Kitty Kitty'
- Joe Exotic TV – Tornado on the Ground

*Id.* at ¶¶ 40-46. These seven videos were made during normal work hours using equipment loaned by Mr. Sandlin and edited (if at all) at the Park's studio. *Id.*

The remaining video – Travis MM Funeral Ceremony – was shot after Mr. Sepi terminated his relationship with the Park. *Id.* at ¶ 47. The video is approximately 23 minutes and 52 seconds long and documents the funeral of Exotic's husband, Travis Maldonado. *Id.* The video records guests arriving at the funeral, Exotic giving a eulogy, and the playing of a memorial video. The video was shot using a camera belonging to Mr. Sandlin and was livestreamed via the *Joe Exotic TV* YouTube channel, where it remained afterward. *Id.* Mr. Sepi shot the video by placing the camera on a tripod and leaving it running. *Id.* He did not edit the video, *id.*, but he did decide where to place the camera by figuring out the best viewpoint. Sepi Depo 2021 at 433:14-434:14. A clip from this video appears in a segment of *Tiger King* lasting approximately one minute and six seconds. The video is interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Exotic. Ex. 1 to Chaiklin Dec. at Ep. 5, 25:51.

Following the release of *Tiger King*, Mr. Sepi obtained copyright registrations for these eight videos. Pls.' Ex. 5-12 [Doc. Nos. 55-5 through 55-12]. Three of the videos are registered under Mr. Sepi's name and five of the videos are registered under Whyte Monkee Production's name. *Id.*

But the story does not stop there. Prior to Mr. Sepi's involvement with the Park, Carol Baskin – a big cat enthusiast and Exotic's nemesis – obtained a $1 million judgment against Exotic. Defs.' Stmt. Undisp. Facts ¶ 15. To collect this judgment, Ms. Baskin initiated garnishment proceedings against Exotic in Oklahoma. *Id.* The dispute between Exotic and Ms. Baskin was a bitter one, and it was an ongoing topic of discussion at the

Park during Mr. Sepi's employment. *See, e.g.,* Ex. 6 to Evitt Dec. [Doc. No. 46-6]; Sepi Depo 2021 at 160:16-22.

On September 13, 2016, approximately one month after leaving the Park, Mr. Sepi gave a deposition as a fact witness in connection with the garnishment proceedings. Defs.' Stmt. Undisp. Facts ¶ 31. At this deposition, Mr. Sepi testified extensively regarding his relationship with the Park and the creation of Whyte Monkee Productions. Most pertinent to this matter, he testified that Exotic hired him to be a "cameraman," his job duties would include "[t]aking still pictures and videoing whatever happens on the park," and he would be working, at least in part, on *Joe Exotic TV*. Sepi Depo 2016 at 73:3-77:25; 88:2-10. Mr. Sepi also testified that he was an employee of the Park, that his job responsibilities included videography, and that this work was performed in exchange for his $150 per week salary. *Id.* at 75:23-76:11; 76:24-77:4; 88:11-20; 96:11-17; 97:97-97:24; 109:4-17; 120:16-121:19; 129:3-133:8; 200:5-8. At that time, he believed that he had been fully compensated for the work he performed for the Park. *Id.* at 246:6-14.

With respect to Whyte Monkee Productions, Mr. Sepi made it abundantly clear at his 2016 deposition that he had nothing to do with the creation of this entity. He testified that he had "never seen" the LLC registration paperwork "before in his life," it was not his idea to create Whyte Monkee Productions, he did not know who came up with the idea, and he did not have access to the email account provided on the paperwork. *Id.* at 134:7-135:19-140:23, 141:8-11; 156:25-158:1. Further, although the name "Tim Sepi" was included as the signatory on the Articles of Organization filed with the Oklahoma Secretary of State, Mr. Sepi testified that he did not give permission for his name to be used and

8

would not have signed the paperwork using the name "Tim." *Id.* at 135:19-136:1; 140:3-23.

Mr. Sepi also testified that he had no control over Whyte Monkee Productions and did not believe he had any right to accounts owned by Whyte Monkee Productions. *Id.* at 158:5-8; 246:6-14. As to whether he thought Whyte Monkee Productions owned any rights to video footage from *Joe Exotic TV*, he was, at best, unclear on the issue. First, he testified that he thought Whyte Monkee Productions was "going to be the company that was used for Joe Exotic TV" but that he "didn't know" that it "would own anything from Joe Exotic TV." *Id.* at 136:2-137:2. He then reiterated that he did not know who owned the rights to *Joe Exotic TV. Id.* 137:17-19. However, later in his deposition, he testified that he believed that all video footage would be owned by Whyte Monkee Productions. *Id.* at 151:17-20. When asked again who owned the content, he responded "[f]rom what it looks like, me." *Id.* at 154:12-13.

Mr. Sepi's testimony on these points changed significantly by the time he filed this lawsuit. In 2021, he gave a deposition in connection with this matter where he directly contradicted his earlier testimony and admitted to committing perjury at his 2016 deposition. Specifically, at his 2021 deposition, Mr. Sepi testified that he came up with the idea to form Whyte Monkee Productions after the studio fire and gained permission from the Park's nonprofit to film videos using this entity. Sepi Depo 2021 at 43:2-14. The purpose of forming a separate entity, Mr. Sepi testified, was to protect the footage that he filmed and produced. *Id.* at 44:13-20. When confronted with the 2016 deposition testimony where he repeatedly denied knowing anything about the formation of Whyte Monkee

Productions, Mr. Sepi initially stated that he was "confused" because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." *Id.* at 105:14-106:15.

Mr. Sepi also testified at his 2021 deposition that he completed the paperwork to register Whyte Monkee as an LLC with the Oklahoma Secretary of State. *Id.* at 110:15-119:19. When confronted with his contradictory 2016 deposition testimony, Mr. Sepi first said he did not know why he answered the question that way. *Id.* at 106:16-109:18. He then responded that he denied ever seeing the registration paperwork because he completed the paperwork electronically. *Id.* When asked about his prior testimony indicating that he would not have used the name "Tim Sepi" on official paperwork, his explanation was that he "just said that." *Id.* at 113:1-114:8. When pressed further as to why he changed his testimony on this specific issue, Mr. Sepi said that he was "attempting to keep myself safe." *Id.* at 115:8-116:20. He explained that he did not know what Exotic was capable of doing, Exotic "thinks he owns it all," and he said whatever he could to "leave on good terms." *Id.* at 115:8-119:22. Later, Mr. Sepi testified that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id.* at 120:1-121:7.

When asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14. He was "nervous, scared, confused" and "feared for his life" but could not explain why lying about the formation of

Whyte Monkee Productions would somehow protect him. *Id.* at 128:20-129:19. Later in his deposition, he testified that he lied because if he didn't provide false testimony about Whyte Monkee Productions he would be locked out of the Park and would not be able to retrieve camera equipment and footage. *Id.* at 138:18-141:15. However, Mr. Sepi also admitted that there was not any reason why Exotic would not want Mr. Sepi to take copies of the footage. *Id.* at 147:21-148:4.

Prior to testifying that he lied at his 2016 deposition, Mr. Sepi initially testified that he had reviewed his 2016 deposition transcript and believed it was truthful. *Id.* at 116:17-20. After he admitted to committing perjury, he attempted to qualify this answer by explaining that he "didn't have time to go through everything" but he "reviewed enough" of the 2016 transcript and "just didn't get all the way to the bottom." *Id.* at 124:1-18. His answer then changed to "I've reviewed it" but "didn't read it" and "[r]eading and reviewing is two totally different things." *Id.*

In addition to the contradictions regarding Whyte Monkee Productions, Mr. Sepi also testified that he was being paid $150 per week for his photography work at the Park, which did not include any videography. *Id.* at 63:8-19; 85:7-10. He testified that when he described himself as a "cameraman" in his 2016 deposition, he did not properly elaborate to indicate that he only meant photography. *Id.* 29:20-31:7. He did not explain why any of his other 2016 statements describing his job duties at the Park were incorrect. *Id.*  Finally, at his 2021 deposition, Mr. Sepi admitted that he committed perjury when he testified in 2016 that Exotic hired him, but did not explain why he lied about this issue. *Id.* at 386:5-9.

## DISCUSSION

Plaintiffs' claim is straightforward: they assert that Defendants infringed their respective copyrights when they used clips from the eight videos in the *Tiger King* series without permission. To succeed on this claim, Plaintiffs must prove two elements: 1) ownership of a valid copyright and 2) unauthorized copying of original elements of the protected work. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc*., 528 F.3d 1258, 1262 (10th Cir. 2008). As to seven of the videos, Defendants argue that Plaintiffs cannot prove the first element because the videos are works for hire belonging to Mr. Sepi's employer. As to the remaining video, Defendants argue that Plaintiffs cannot prove the second element because the video lacks the required originality. Alternatively, Defendants argue that, even if Plaintiffs own a valid copyright, the use of the clips was fair use such that no copyright infringement occurred. Each of these issues is addressed in turn.

### A. Ownership and Originality

#### 1. Works for Hire

Although ownership "vests initially in the author or authors of the work," 17 U.S.C. § 201(a), the Copyright Act carves out an "an important exception" for works made for hire. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17

U.S.C. § 201(b). The Copyright Act defines a work made for hire as one that is "prepared by an employee within the scope of his or her employment."[1] *Id*. at § 101(1).

Defendants assert that seven of the eight videos involved in this litigation qualify as works for hire because they were created while Mr. Sepi was an employee of the Park and were made within the scope of his employment. Plaintiffs do not dispute that Mr. Sepi was an employee of the Park but argue that his duties for the Park were separate from his videography[2] services. The relevant inquiry, then, turns on whether the videos were made within the scope of Mr. Sepi's employment for the Park. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012) (addressing only scope of employment because it was undisputed that alleged copyright owner was employee); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (same); *Fleurimond v. New York Univ.*, 876 F. Supp. 2d 190, 199 (E.D.N.Y. 2012) (same).

Because the Copyright Act does not define when a work is created within the scope of employment, "common-law agency principles govern resolution of that question." *Peiffer*, 21 F.3d at 571 (quoting *Reid*, 490 U.S. at 739-40). Accordingly, numerous courts have adopted the three-prong test expressed in Section 228 of the Restatement (Second) of Agency in determining whether a work was made within the scope of employment. *See,*

---

[1] A work made for hire is also defined to include "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. §101(2). The parties do not contend that this provision is applicable.

[2] As used here, the term "videography" encompasses filming and editing work.

*e.g., U.S. Auto Parts*, 692 F.3d at 1015; *Peiffer*, 21 F.3d at 571; *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004); *Sterpetti v. E-Brands Acquisition, LLC*, No. 6:04-CV-1843-ORL-3DA, 2006 WL 1046949, at *5 (M.D. Fla. Apr. 20, 2006); *Fleurimond*, 876 F. Supp. 2d at 199. Section 228 provides that conduct of a servant is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228(1) (1958).[3] As explained below, Mr. Sepi's conduct meets each of these three elements.

---

[3] The parties rely on the formulation of "scope of employment" articulated in § 228 of the Restatement (Second) of Agency in their analysis, as opposed to the more recent version articulated in § 7.07 of the Restatement (Third) of Agency. The Restatement (Third) of Agency provides that

> [a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Restatement (Third) Of Agency § 7.07(2) (2006). The comments to this section indicate that, as compared to the definition used in the Restatement (Second) of Agency, this formulation is "phrased in more general terms" and designed to accommodate "contemporary workforces" where employees may not be "situated on the employer's premises nor continuously or exclusively engaged in performing assigned work." *Id.* at cmt. b. Because the parties rely on the formulation contained in the Restatement (Second) of Agency, the Court has also structured its analysis using this formulation. Opinions post-dating the publication of the Restatement (Third) of Agency have similarly relied on the Restatement (Second) of Agency's three-part formulation when analyzing whether a work was made for hire under the Copyright Act. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 277 (3d Cir. 2019); *U.S. Auto Parts*, 692 F.3d at 1015; *Fleurimond*, 876 F. Supp. 2d at 199. However, regardless of which definition is used, the Court would reach the same result.

a.  *Whether the conduct was "of the kind" the servant was employed to perform.*

At his 2016 deposition, Mr. Sepi testified – unequivocally – that he was hired to perform videography work which would include, at least in part, producing videos for *Joe Exotic TV*. He further testified that he eventually came to understand that he was working for the Park and that he filmed and produced videos featuring Exotic in exchange for his $150 per week salary from the Park. Although Mr. Sepi's ability to perform the full range of his job duties was temporarily halted when the Park's studio was destroyed, he was still employed as a videographer and he resumed performing these duties once the studio was rebuilt. As to Whyte Monkee Productions, Mr. Sepi testified that he neither created nor controlled it. This testimony is fatal to his copyright infringement claim – no reasonable juror could interpret the 2016 testimony as establishing anything other than Mr. Sepi's admission that he was a Park employee who was performing videography work within the scope of his employment.

But Mr. Sepi's testimony has changed. According to his 2021 deposition testimony, he was hired solely to perform photography services and he personally conceived of and set up Whyte Monkee Productions as a separate venture for his videography work. Mr. Sepi does not attribute this drastic change in testimony to a failure of memory or confusion, but to a brazen act of perjury. He contends that the testimony he provided in 2016 (which is now unfavorable to him) was simply a lie. Unsurprisingly, Defendants argue that the 2021 testimony should be excluded under the sham affidavit doctrine.

The sham affidavit doctrine provides that an affidavit conflicting with the affiant's prior sworn statements should be disregarded when "it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). The policy underlying this rule is obvious: "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* Although the rule is typically applied to affidavits submitted during summary judgment briefing, it has also been applied to preclude corrections on a deposition errata sheet, *Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003), and later deposition testimony that contradicts an earlier sworn statement. *Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir. 2006) (unpublished); *Essick v. Yellow Freight Sys., Inc.,* 965 F.2d 334, 336 (7th Cir. 1992). "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 127.

Although Mr. Sepi was not represented by a lawyer during his 2016 deposition or cross-examined in the traditional sense, he did have access to the pertinent evidence and his responses reflected no confusion regarding either the job he was employed to perform or his lack of involvement in the formation or operation of Whyte Monkee Productions. Moreover, the inconsistencies in his testimony are not slight variations affecting only the weight of the evidence, but direct contradictions on issues that are dispositive of his claims.

Still, there *might* be a case for not excluding the later testimony as a sham had Mr. Sepi provided a rational explanation for lying under oath. But he did not.

Start with the testimony regarding his job responsibilities. At his 2021 deposition, Mr. Sepi stated that he was paid by the Park only for his photography work, that he was not hired by Exotic, and that he was hired only as a photographer.[4] Sepi Depo 2021 at 63:8-19; 85:7-10; 386:5-9. These statements plainly contradict his 2016 testimony, where he stated that Exotic hired him, he was hired to work partly on *Joe Exotic TV*, and that his Park salary included videography work.[5] Sepi Depo 2016 at 74:9-76:11. His only attempted explanation for these contradictions is that when he used the word "cameraperson" in his 2016 deposition to describe what Exotic hired him to do, he did not properly specify that he meant only still photography. *Id.* at 29:20-31:10. But Mr. Sepi demonstrated no confusion at his 2016 deposition regarding the duties of a cameraman and even explained that "[c]ameraman can mean still or video." Sepi Depo 2016 at 88:8-10. In any event, Mr. Sepi's subsequent clarification of his testimony goes to a single question and fails to

---

[4] Although Mr. Sepi testified in 2021 that he was hired only as a photographer, Plaintiffs' response brief states otherwise. Plaintiffs' Statement of Additional Material Facts admits that Mr. Sepi was hired – not as a photographer taking still photos of park tours – but as a cameraman on *Joe Exotic TV* for $150 per week. The inconsistency between Mr. Sepi's 2021 testimony and the admissions made in Plaintiffs' brief further supports the Court's conclusion that Mr. Sepi's 2021 testimony is designed to create a sham issue of fact.

[5] Plaintiffs argue that this testimony describes only what Mr. Sepi was hired to do, and not what his job responsibilities were following the studio fire. Pls.' Br. at 14. However, as Defendants point out in their reply brief, this is a tortured reading of Mr. Sepi's 2016 testimony. Mr. Sepi's 2016 testimony indicates that he worked for the Park as a videographer even after the studio was rebuilt. *See, e.g.* Sepi Depo 2016 at 97:9-98:14; 120:20-121:13.

address the other statements he made in 2016 indicating that he was filming and producing videos as part of his employment for the Park.

With respect to his testimony regarding the formation of Whyte Monkee Productions, Mr. Sepi could not provide a consistent explanation as to why he lied. At the outset of his 2021 deposition, he indicated that he reviewed his 2016 testimony and believed it to be truthful. When confronted with his 2016 testimony indicating that he did not know why Whyte Monkee Productions was created, he first stated that he was "confused" by what he was being asked because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." Sepi Depo 2021 at 105:14-106:15. He did not explain how these features would cause confusion when responding to a question as straightforward as "Do you know why it was created at that time, what the purpose was?" Sepi Depo 2016 at 104:9-11.

Similarly, when Mr. Sepi was confronted with his 2016 testimony indicating he had never seen the LLC paperwork for Whyte Monkee Productions, Mr. Sepi first stated that he did not know why he answered the question that way. He quickly changed tack and asserted that he said he had not seen the paperwork before because it was filed electronically. If that is true, it represents an unreasonably narrow interpretation of the deposition question and an inappropriately evasive response. Moreover, his explanation does not account for the testimony directly surrounding his response, where he acknowledged that the paperwork was obtained from a state website, that the paperwork submission date had no significance to him, and that he did not know how Whyte Monkee Productions came to be created. *Id.* at 134:7-136:15.

18

Mr. Sepi's explanation for committing perjury in 2016 continued to evolve as his deposition went on. When asked why he stated in 2016 that he would not have signed the LLC paperwork using the name "Tim," he said he "probably just said that." *Id.* at 112:20-114:8. Eventually, he explained that he lied because he feared for his life and wanted to keep on good terms with Exotic.[6] *Id.* at 115:8-122:22. He then elaborated that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id*. At another point in his 2021 deposition, he testified that he lied because if he didn't provide false testimony he would be locked out of the Park and would not be able to acquire camera equipment and footage. *Id.* at 140:9-141:15. But when asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14.

Ultimately, Mr. Sepi's 2021 testimony regarding his job responsibilities and the formation of Whyte Monkee directly contradicts his earlier sworn testimony and he has failed to offer a rational or consistent explanation for the contradictions. Because the testimony is in direct conflict and the contradictions are not the result of confusion, a failure

---

[6] It must be noted that this explanation makes no sense. The 2016 testimony was given in connection with the garnishment proceeding initiated by Exotic's rival, Carol Baskin, in an attempt to collect on her $1 million judgment. Mr. Sepi's 2016 testimony disclaiming knowledge of Whyte Monkee Production's creation and denying he had the ability to control its accounts *hurt* Exotic's interests with respect to the garnishment and would presumably not be what a person would say if they wanted to keep on good terms with Exotic.

of memory, or newly discovered evidence, Mr. Sepi's 2021 testimony is appropriately excluded as a transparent attempt to create a sham issue of fact. *See Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1017 (10th Cir. 2002) (excluding affidavit that contradicted deposition testimony because nothing in deposition questions suggested deponent should limit his answers to particular meetings or conversation); *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001) (excluding defendant's affidavit that came into existence a year and half after deposition, directly contradicted earlier testimony, and which was detrimental to plaintiff's sole remaining cause of action); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 894 (10th Cir. 1997) (excluding affidavit that specified key information where earlier deposition testimony responses were "probably not" and "I don't know"); *Barber v. Hallmark Cards, Inc.,* 74 F.3d 1248 (10th Cir. 1996) (unpublished) (excluding affidavit that directly contradicted deposition testimony because testimony was unequivocal and did not reflect confusion); *Rios v. Bigler,* 67 F.3d 1543, 1551 (10th Cir. 1995) (excluding affidavit testimony because deposition was unequivocal and deponent had access to relevant materials); *Franks,* 796 F.2d at 1237 (excluding affidavit that directly contradicted prior sworn testimony). No other result is warranted – litigants cannot be permitted to create a fact issue by simply dismissing as a lie prior sworn testimony that no longer serves their purpose, particularly when they cannot offer anything other than a nonsensical, inconsistent explanation for their actions.

Without Mr. Sepi's 2021 testimony to rely on, the only other evidence Plaintiffs offer is an unnotarized declaration from former Park manager John Reinke stating that

"Sepi was hired as the parks [sic] photographer for zoo tours and graphic designer"[7] and "[s]eperate from employment duties at the Zoo, Sepi produced content for the Joe Exotic TV YouTube channel under Whyte Monkee Productions LLC." Ex. 4 to Pls. Br. Defendants object to the admissibility of this declaration as running afoul of Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge and does not show that Mr. Reinke is competent to testify on these matters. However, Rule 56(c)'s requirements of personal knowledge and competence may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge. *Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (unpublished). Construing the evidence in the light most favorable to Plaintiffs, it can reasonably be inferred that the park manager, who worked at the park during the duration of Mr. Sepi's employment, would have at least some personal knowledge of Mr. Sepi's job responsibilities.

However, to establish a fact for summary judgment purposes, an "affidavit must set forth facts, not conclusory statements." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999). Mr. Reinke's declaration provides only a conclusory statement that Mr. Sepi's videography work was a separate enterprise for Whyte Monkee Productions and fails to include any facts indicating how he came to know of this arrangement, the details of the arrangement, or the purpose of the arrangement. Mr. Reinke's affidavit is therefore insufficient to create a factual dispute on this issue. *Lantec, Inc.*, 306 F.3d at 1019 (refusing to consider verified complaint on summary judgment

---

[7] Mr. Reinke's statement is contradicted by Plaintiffs' brief which states that Mr. Sepi was hired to work as a cameraman on *Joe Exotic TV*.

because it "did little more than state a legal conclusion" and failed to include details regarding an alleged oral contract); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856 n. 9 (10th Cir. 1999) (finding affidavit submitted on summary judgment "unpersuasive because much of it is conclusory, vague, and/or lacking in foundation" and fails to include details regarding alleged agreement).

In any event, even crediting Mr. Sepi's 2021 testimony, videography is sufficiently related to photography to be considered "of the kind" of work Mr. Sepi was employed to perform. Mr. Sepi testified in 2021 that after the studio was destroyed, he was working for the Park "doing photography for the tours," "doing marketing photos," and "doing audio in the gift shop and the audio at the stage area." Sepi Depo 2021 at 57:10-18. This type of work – photography, audio set up, and marketing – is similar in kind to the videography work Mr. Sepi was also performing. Indeed, as even Mr. Sepi admits, photography and videography involve overlapping skills, both fall under the umbrella of camera operation, and both involved promotion of the Park. Sepi Depo 2021 at 212:16-21. The videography work, then, is more aptly described as an expansion of the photography work Mr. Sepi was already performing for the Park rather than a departure from that work, and as such, it falls within the scope of his employment. *See Fleurimond,* 876 F. Supp. 2d at 204 (artistic creation of mascot for university within scope of employment for graphic designer employed to create seals, signs, and banners for university website); Restatement (Third) of Agency §7.07(2) cmt b (describing work as outside the scope of employment where it "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls.").

Plaintiffs respond that – perjured statements aside – Mr. Sepi testified consistently in 2016 that he believed Whyte Monkee Productions owned the rights to the footage produced under its name. But the relevant inquiry is whether an employee's conduct in creating the work was "of the kind" he was employed to perform, not whether the employee believed he owned the work or wished to keep it separate. Moreover, material created separate from an employee's normal responsibilities can still fall within the scope of employment if its creation is incidental to an employee's job duties and within the ultimate objective of the principal. *See Genzmer v. Pub. Health Tr. of Miami-Dade Cty.,* 219 F. Supp. 2d 1275, 1281 (S.D. Fla. 2002) (creation of computer program by doctor undertaking research project within scope of employment); *Vanderhurst v. Colorado Mountain Coll. Dist.,* 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (outline created by teacher on his own time and with own materials was a work for hire); *Miller v. CP Chemicals, Inc*., 808 F. Supp. 1238, 1243-44 (D.S.C. 1992) (creation of computer program by lab supervisor on his own time and with own materials was a work for hire). Videography of the Park and Exotic (the Park's entertainment director) was incidental to Mr. Sepi's employment as Park photography and, importantly, both tasks were within the Park's objective of promoting its activities. Mr. Sepi's videography work was therefore "of the kind" Mr. Sepi was employed to perform.

Finally, the fact that Mr. Sepi and Exotic (or anyone else at the Park) may have orally agreed to define Mr. Sepi's work as separate from his Park duties is not sufficient to place the conduct outside the scope of employment or to vary the ownership rights of a work made for hire. 17 U.S.C. § 201(b) (requiring signed, written instrument to vary

ownership rights); *Fleurimond*, 876 F. Supp. 2d at 207-208 ("Moreover, to the extent the parties may have orally agreed to define the Plaintiff's work as one outside the scope of her employment, such an agreement is non-enforceable under the Copyright Act."). The same is true with respect to the formation of a limited liability company. Where an employee creates a work within the scope of employment, a work does not cease to be a work made for hire simply because the employee creates a separate entity. As Mr. Sepi was acting within the scope of his employment for the Park, the videos are works for hire with authorship vesting in the Park. Had the involved parties wished for authorship to vest in Whyte Monkee Productions or in Mr. Sepi individually, they should have executed a written agreement pursuant to 17 U.S.C. § 201(b).

Accordingly, Defendants have met their burden of demonstrating that there is no genuine dispute that Mr. Sepi's videography work was of the kind he was employed to perform.

> b. *Whether the work occurred substantially within the authorized time and space limits.*

Having satisfied the first element for demonstrating that the videos were created within the scope of employment, Defendants must still prove the two remaining elements. The second element requires proof that the employee's conduct occurred substantially within the authorized time and space limits. Plaintiffs offer no specific argument in response to Defendants' assertion that this element is satisfied. The undisputed facts show that Mr. Sepi split his workday between photography, filming, and editing, that the videos were filmed on or near Park premises, that he completed at least some of this work at a

studio on Park premises, and that he used at least some camera and computer equipment that was procured by someone at the Park for his use. Defendants have therefore met their burden of establishing that the work occurred substantially, if not entirely, within the authorized time and space limits.

      c. *Whether the work was actuated, at least in part, by a purpose to serve the employer*.

Finally, Defendants must show that Mr. Sepi's conduct in creating the videos was actuated, at least in part, by a purpose to serve the Park. Plaintiffs do not dispute that Mr. Sepi filmed the videos "to provide publicity for the Zoo" and to make Exotic look good. Thus, even if part of Mr. Sepi's motivation was to eventually license the footage or otherwise use it for his own purposes, his work was at least partly actuated by a desire to serve the Park.

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, and considering the record as a whole, no reasonable juror could conclude that the seven videos at issue were created outside the scope of Mr. Sepi's employment for the Park. The videos therefore qualify as works for hire under § 201(b) of the Copyright Act, and Mr. Sepi's employer[8] is the author of the works.

## 2. Originality

The sole remaining video at issue is titled Travis MM Funeral Ceremony and was filmed after Mr. Sepi ended his employment with the Park. Defendants argue that this video

---

[8] Whether that be the Gerald Wayne Interactive Zoological Park, the Greater Wynnewood Zoological Park, or some other entity is not relevant. All that matters for purposes of this litigation is that the works are not owned by Mr. Sepi or Whyte Monkee.

is not subject to copyright protection because it lacks originality. In support of this argument, Defendants rely on *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008), where the Tenth Circuit explained that "not every work of authorship, let alone every aspect of every work of authorship, is protectable in copyright; only original expressions are protected." An original expression is one that is "'independently created by the author (as opposed to copied from other works).'" *Id.* at 1263 (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). With respect to a medium like photography, a photograph is subject to copyright to the extent it "reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like." *Id.* at 1264. Applying these principles, the Tenth Circuit in *Meshwerks* held that digital models of Toyota vehicles that were developed to be used on Toyota's website were not original, and therefore not copyrightable, because they were unadorned copies that did not involve making any decisions regarding lighting, shading, angle, and so on. *Id.* at 1265-66.

The same cannot be said here. Mr. Sepi admits that the video was filmed using a tripod and was unedited, but he also testified that he decided where to place the camera by figuring out the best viewpoint. The video itself shows the camera zooming in and out several times and panning around the scene, further suggesting that Mr. Sepi made at least some intentional decisions regarding angle, focus, and what to film. Just as these elements are sufficient to make a photograph of a real world object copyrightable, they are sufficient to make a video of a real world event copyrightable. *See Feist*, 499 U.S. at 1289 ("Thus, even a directory that contains absolutely no protectible written expression, only facts,

meets the constitutional minimum for copyright protection if it features an original selection or arrangement."). And, unlike in *Meshworks*, 528 F.3d at 1264, where the models were "not so much independent creations as (very good) copies of Toyota's vehicles," this video is not a copy of another work but an independent creation. Thus, construing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that the Travis MM Funeral Ceremony video contains elements of originality that are subject to copyright.

Because there is at least a factual dispute as to the originality of the video, and the video is not a work for hire, it is necessary to evaluate Defendants' alternative argument – that their use of the video in *Tiger King* was a fair use that did not infringe Mr. Sepi's copyright.

## B. Fair Use

Under § 107 of the Copyright Act, "a copyright holder cannot prevent another person from making a 'fair use' of copyrighted material." *Google LLC v. Oracle Am., Inc.*, __ U.S. __, 141 S. Ct. 1183, 1196 (2021). This doctrine embodies "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Copyright Act sets out four nonexclusive factors that courts must consider in determining whether the use of a protected work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. When evaluating fair use, all of these factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 578 (1994)*.* "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

Defendants contend that, applying the four factors outline in the Copyright Act, their use of all eight videos qualifies as a fair use. However, because seven of the videos are works for hire with authorship vesting in Mr. Sepi's employer, it is only necessary to determine whether Defendants' use of the remaining video – Travis MM Funeral Ceremony – was a fair use. *See PDK Lab'ys Inc. v. U.S. D.E.A*., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").

### 1.  Purpose and Character of the Use

The first factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Where a defendant's use of a protected work qualifies as "criticism, comment, news reporting, teaching…scholarship, or research," there is a strong presumption that this

factor favors the defendant. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). But the core of this inquiry is "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal citation and quotation marks omitted) (alteration in original). Put another way, this factor asks "whether and to what extent the new work is 'transformative.'" *Id.* "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

The parties have very different views of the *Tiger King* series. Defendants describe it as a documentary providing criticism and commentary on Exotic's behavior, roadside zoos, and contemporary society, whereas Plaintiffs liken it to a reality show that serves only to entertain. But under either categorization, there can be no dispute that Defendants' use of the Travis MM Funeral Ceremony video serves a different purpose than the one Mr. Sepi intended.

At his 2021 deposition, Mr. Sepi testified that he created the video "[f]or remembrance" and that it was livestreamed on YouTube without any editing, where it remained afterward. Sepi Depo 2021 at 425:19-21. Defendants' use and purpose is decidedly different – they have excised a relatively small portion of the video, interspersed it with comments from Mr. Maldonado's mother that are critical of Exotic, and woven it into the larger narrative of the series. Thus, whether for entertainment value, cultural commentary, or both, Defendants have imbued the original video with a different character

and altered its message. Rather than "merely repackage[ing] or republish[ing]" the Travis MM Funeral Ceremony video, Defendants have used it as "raw material" to create "new information, new aesthetics, new insights and understandings." *Seltzer v. Green Day, Inc*., 725 F.3d 1170, 1176 (9th Cir. 2013) (quotation omitted). Their use is therefore transformative, and this factor weighs in favor of fair use. *See Bill Graham Archives*, 448 F.3d at 609-610 (use of copyrighted images in biography accompanied by commentary and when standing alone was transformative because it was "plainly different from the original purpose for which [the images] were created."); *SOFA Ent., Inc. v. Dodger Prods., Inc*., 709 F.3d 1273, 1278 (9th Cir. 2013) (use of clip of the Four Seasons performance on *The Ed Sullivan Show* in a musical about the Four Seasons was transformative because it was used as a "biographical anchor" rather than "for its own entertainment value"); *Red Label Music Publ'g, Inc. v. Chila Prods*., 388 F. Supp. 3d 975, 984 (N.D. Ill. 2019) (football documentary's use of clip of *Super Bowl Shuffle* song was transformative because the song was "not serving its original function of entertainment in the film.").

The commercial nature of *Tiger King* does not undermine this conclusion. The clips from the Travis MM Funeral Ceremony video comprise a tiny fraction of the series and are not themselves exploited for commercial gain. *Seltzer*, 725 F.3d at 1178 (finding that use of copyrighted image at concert was only incidentally commercial because it was never used to market concert or merchandise). Additionally, "[w]hen the defendant does not merely duplicate and copy verbatim the original in its entirety, pecuniary gain is largely a non-issue." *Red Label Music Publ'g, Inc*, 388 F. Supp. 3d at 985 (citing Campbell, 510 U.S. at 591).

### 2.   Nature of the Copyrighted Work

The second factor in the fair use inquiry – the nature of the copyrighted work – recognizes that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Generally, the law "recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 563 (1985). Whether a work has been published is also critical to its nature: "the scope of fair use is narrower with respect to unpublished works" but "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public." *Id.* 563.

Although perhaps possessing some elements of originality with respect to angle, lighting, and framing, the Travis MM Funeral Ceremony video is not a work of fiction or artistry. The video is more factual than creative, which tips the scales slightly in favor of fair use. More important, however, is that the video was previously published – it was livestreamed via YouTube and remained there afterwards – and Defendants' use of a few select clips therefore did not infringe Mr. Sepi's "right to control the first expression" of the work. *Id.*; *see also Seltzer*, 725 F.3d at 1178. This factor therefore also weighs in favor of fair use.

### 3.   Amount and Substantiality of the Portion Used

The third factor concerns the amount and substantiality of the portion used and is reviewed "with reference to the copyrighted work, not the infringing work." *Bill Graham*

*Archives*, 448 F.3d at 613. This factor requires courts to consider not only "the quantity of the materials used," but also "their quality and importance." *Campbell*, 510 U.S. at 587. So long as "the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003).

The portions of the video used by Defendants show Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by Exotic to a person wanting to view the funeral. Quantitatively, only a tiny portion of the Travis MM Funeral Ceremony video is featured in *Tiger King*. Because Defendants' use of the video comprises a small portion of the original, this factor weighs in favor of fair use.

### 4. Effect on the Potential Market for or Value of the Work

The final factor "asks what effect the allegedly infringing use has on the 'potential market for or value of the copyrighted work.'" *Seltzer*, 725 F.3d at 1179 (quoting 17 U.S.C. § 107(4). This factor requires consideration of "the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant...would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation omitted). When "a commercial use amounts to mere duplication of the entirety of an original" and "serves as a market replacement," it is more likely that "cognizable market harm to the original will occur." *Id.* at 591. Conversely, when "the second use is

transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Id.*

*Tiger King* is not a substitute for the Travis MM Funeral Ceremony video. It is not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement. Given that Mr. Sepi filmed this particular video as a means of remembering his friend, and not as a creative or entertainment venture, Defendants' use of the video has therefore not usurped any primary market for the work. *SOFA Ent., Inc.,* 709 F.3d at 1280 (no market harm where second work was not a substitute for the original); *Bill Graham Archives*, 448 F.3d at 614 (transformative work did not cause market harm). Further, to the extent Mr. Sepi intends to license the video or certain clips, the portions featured in *Tiger King* are "too few, too short, and too small in relation to the whole" to undercut any market for this material. *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 495 (S.D.N.Y. 1996). Potential purchasers of the Travis MM Funeral Ceremony video or clips from this video are unlikely to purchase that material from Defendants, as opposed to Plaintiffs, and Defendants' use of the video will therefore have a minimal effect on any potential markets or the value of this work. *Red Label Music Publishing, Inc.*, 388 F. Supp. 3d at 898.

In sum, each of the four statutory factors favors a finding that Defendants' use of portions of the Travis MM Funeral Ceremony video was a fair use. Considering these factors together, and mindful that copyright aims to both "secure a fair return for an 'author's' creative labor" and "stimulate artistic creativity for the general public good,"

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), Defendant's use of the Travis MM Funeral Ceremony video was fair use.

## CONCLUSION

For the reasons stated above, the court finds that Defendants are entitled to summary judgment on Plaintiffs' copyright infringement claim.

**IT IS THEREFORE ORDERED** that Defendants Netflix, Inc. and Royal Goode Productions LLC's Motion for Summary Judgment [Doc. No. 46] is **GRANTED**.

**IT IS SO ORDERED** this 27th day of April, 2022.

 

TIMOTHY D. DeGIUSTI
Chief United States District Judge